65 Cal.Rptr.3d 738 (2007)
155 Cal.App.4th 170
The PEOPLE, Plaintiff and Respondent,
v.
Sarun CHUN, Defendant and Appellant.
No. C049069.
Court of Appeal of California, Third District.
September 14, 2007.
*741 Mark D. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Senior Assistant Attorney General, John G. McLean and Melissa Lipon, Deputy Attorneys General, for Plaintiff and Respondent.
MORRISON, J.
After a drive-by shooting in which one person was killed and two injured, defendant was convicted by jury of second degree murder (Pen.Code, § 187), and street terrorism (Pen.Code, § 186.22, subd. (a)). With respect to the murder conviction, the jury found true allegations that a principal intentionally discharged a firearm (Pen. Code, § 12022.53, subd. (e)) and that the murder was committed to benefit a street gang (Pen.Code, § 186.22, subd. (b)(1)).[1] *742 Defendant was sentenced to 55 years to life and ordered to pay $65,091.30 in victim restitution. On appeal, defendant challenges the use of his admissions to detectives, the theory of second degree felony murder, the gang enhancement, and the victim restitution.
We reverse the murder conviction and otherwise affirm. While we find defendant's first admission that he was in the car admissible, we find his subsequent admission that he fired a gun should have been excluded because it was procured by a false promise of leniency. Second degree felony murder, the only express theory of second degree murder offered to the jury, was based on the underlying felony of shooting into an occupied vehicle. The merger doctrine prevents using an assaultive-type crime as the basis for felony murder unless the underlying crime is committed with an intent collateral to committing an injury that would cause death. Without the evidence of defendant's statements about the shooting, there was no evidence from which a collateral intent or purpose could be found. Accordingly, it was error to instruct on second degree felony murder and the murder conviction must be reversed.

FACTS
Judy Onesavanh and Sophal Ouch were planning a party for their son's birthday. About 9 p.m. on September 13, 2003, they and a friend, Bounthavy Onethavong, were driving to the store in a blue Mitsubishi owned by Onesavanh's father. Onesavanh has a brother named George who also drives the car. The police consider George a higher up in the Asian Boys street gang (ABZ); he is known as Crazy George. ABZ is affiliated with the Crips.
Ouch was driving that night. Onesavanh was in the front passenger seat and Onethavong was behind Ouch. They stopped in the left turn lane on Lan Arc, at the intersection with Hammer Lane. A blue Honda with tinted windows pulled up beside them. When the light changed, there was gunfire from the Honda, at least six shots.
All three occupants of the Mitsubishi were hit. Onethavong was killed; he had two bullet wounds to the head. Onesavanh was hit in the back. She spent a month and a half in the hospital, could not walk for six months, and lost a kidney. The bullet that struck her could not be removed without paralyzing her. Ouch was shot in the cheek and his jaw fractured. He spent a week in the hospital and lost his sinus system.
Ouch and Onesavanh were able to identify the Honda and its driver as T-Bird. The police knew T-Bird to be Rathana Chan, a member of the Tiny Rascals Gangsters (TRG). Chan was never found. TRG is a Southeast Asian street gang affiliated with the Bloods. There were 40 documented members of TRG in Stockton. TRG associates with the number 7126 and the color gray, as well as red. TRG's crimes include auto theft, possession of drugs for sale, shootings and homicide. All of the Crip gangs in Stockton, including ABZ, do not get along with TRG. The Original Blood gang (OB) has a close affiliation with TRG.
The forensic evidence showed that three guns were used in the shooting, a .22, a .38 and a .44, and at least six bullets were fired. Both the .38 and the .44 struck Onethavong; both shots were lethal. The only gun recovered was the .44. It was found in a search of the residence of Sokha and Mao Bun, two brothers believed to be *743 gang related. Sokha Bun was a documented member of OB and had prior contacts with members of TRG. The police found two guns, a .44 and a nine-millimeter, in the search; both guns had been reported stolen.
Two months after this shooting, the police were investigating another suspected gang shooting that occurred on Bedlow Drive. They were watching a van believed to have been involved in the shooting. When three young Asian males got in the van, the police effected a traffic stop. Mao Hin was driving and Rattanak Kak and defendant were passengers. Defendant was arrested, read his Miranda rights (Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694), and taken to the police station for questioning. He was interviewed twice concerning the Bedlow shooting and denied any involvement. Subsequently, Detectives Youn Seraypheap and J.J. Reyes interviewed him about the September shooting on Lan Arc. Defendant admitted he was in the back seat of the Honda with Rattanak Kak; T-Bird was driving and Mao Hin was the front passenger. Defendant admitted he fired a .38 firearm.
Defendant, Hin and Kak were charged in a 31-count information. The information included charges against Hin and Kak for another murder. By the time of trial, the case of the September shooting on Lan Arc proceeded only against defendant. Defendant, who was 16 years old at the time of the shooting, was tried as an adult; he was charged with murder, with drive-by and gang special circumstances, and two counts of attempted murder, discharging a firearm from a vehicle, and shooting into an occupied vehicle, all with gang and firearm use allegations, and street terrorism.
In a search of defendant's bedroom, officers found pictures in a shoe box of defendant with Hin and Bun, and gang writing and symbolism indicative of TRG. They also found CD's with gang markings, including "CK," which stood for Crip Killer, and the word "Snub." While in detention, defendant had carved "TRG" on his Styrofoam cafeteria tray and his door. Defendant threatened a unit supervisor, telling him: "Fuck you. I don't give a fuck. One to the dome. This is how we do it." Defendant made a shooting motion with his finger. Another time, defendant told the supervisor: "You don't know who you are fucking with, nigga, this is TRG. Bang, bang, mother fucker. That's how we do it. Yeah, nigger. Wait till I get out. Bang to the dome. Fuck that. You'll see when I get out."
At trial, a detective in the gang suppression unit testified TRG met the statutory definition of a street gang. In her opinion, defendant was a member of TRG and the shooting was for the benefit of a gang.
The defense presented the testimony of S.G, a witness to the shooting, and the officer who interviewed her. S.G. was behind the Mitsubishi at the stop light. S.G. told the officer she saw six gunshots from the Honda; she saw a muzzle flash from the front passenger seat. She saw three people in the Honda.
Two of defendant's cousins testified he went to Oakland to visit relatives around the time of the shooting, but they could not specify the date of the trip.
Defendant testified in his defense. He had been born in Stockton and was called "Snub" in high school; he was short before he went to juvenile hall and drank milk.[2] He had had the opportunity to become *744 TRG, but did not take it. He explained his CD collection by indicating he liked TRG music. He met T-Bird and Rattanak Kak through Mao Hin. He heard rumors about the September shooting, including that a .38 was used. When he was interviewed by the police, he was very tired and scared when they told him he would be charged for the Bedlow shooting. He tried to cooperate with the detective by naming the people in the pictures. Defendant asserted he was not in T-Bird's car; he did not shoot or possess weapons; he did not encourage others to shoot.
The prosecution asked for a first degree murder conviction. The jury was also instructed on second degree felony murder based on shooting at an occupied motor vehicle either directly or as an aider and abettor.
The defense argued defendant was not present at the shooting and therefore not guilty. He admitted being in the Honda and firing a gun because he had been without sleep for 34 hours, was easily confused, and was promised leniency if he cooperated. The defense asserted the tape of the interview showed that defendant could not tell what happened on his own; he did not know.
During deliberations, the jury asked about the definition of corpus delecti and whether it could convict defendant if the only evidence against him was his admission. The court answered yes, if the elements of the crime were independently proven. The jury also requested a rereading of the testimony of S.G. and the officer who interviewed her.
The jury found defendant guilty of second degree murder; it found the personal use allegation not true, but that a principal intentionally used a firearm and the shooting was committed for the benefit of a criminal street gang. The jury acquitted defendant of both counts of attempted murder, shooting from a motor vehicle, and shooting at an occupied motor vehicle. The jury convicted defendant of being an active participant in a criminal street gang.

DISCUSSION

I. Suppression of Defendant's Statement
Defendant contends the trial court erred in denying his motion to suppress his statements to Detectives Seraypheap and Reyes that he was in the Honda and fired a .38 revolver. He contends the statements were coerced; they were elicited by implied threats and implied promises of leniency. Since without these statements, there was no evidence tying defendant to the shooting, defendant contends the judgment must be reversed.

Factual Background
Defendant was detained by the police shortly after midnight on November 9, 2003. Officer Gutierrez read defendant his Miranda rights from a card. Defendant was interviewed about the Bedlow shooting at 2:40 a.m. and again at 3:30 a.m. At 5:00 a.m. defendant was transported to the Stewart Eberhardt Building. From 5:00 a.m. until 3:50 p.m. defendant was left alone; he was given food and water and allowed to use the restroom. Defendant never complained that his needs were not met. At no time did defendant ask to speak to an attorney or indicate he wanted to remain silent. He did not ask to speak with his parents. A third interview of less than an hour took place at 3:50 p.m. Defendant was again advised of his Miranda rights.
At 9:20 p.m. Detectives Seraypheap and Reyes interviewed defendant about the Lan Arc shooting. Defendant's statements in this interview are at issue. The interview was videotaped and a transcript prepared. The interview lasted 42 minutes. *745 The detectives testified defendant had no trouble understanding them and did not appear tired or under the influence of alcohol or drugs. The trial court watched the tape of the interview before ruling on the motion to suppress.
Seraypheap told defendant they wanted to talk to him about "different stuff than the earlier interviews and reminded defendant of his Miranda rights. Seraypheap asked if defendant had ever been in trouble. When defendant admitted he had received six days in work camp for pushing a security guard, the detective replied, "That's not bad." Seraypheap explained that had been talking to the other two guys, who had "many, many stories" to tell.
Defendant indicated he was called "Snub" or "Boy." He was shown pictures and identified T-Bird and Rattanak Kak. When defendant claimed he did not remember being in the car at the Lan Arc shooting, Seraypheap told him he better remember because he was going to go to prison at 16 for the Bedlow shooting; his friends said he was there. The detective told defendant he would be charged with the Lan Arc shooting where one died. He told him to learn from his mistake at 16 because he was not that tough. "When you go to prison, you ain't gonna be tough 'cause on a soaking wet day you maybe weighing one hundred fifty pounds, that's it. You get guys that are huge. Okay? I'm not trying to scare you or nothing like that. Just be aware of it, that no matter what you say to me tonight you are going to prison. You understand that?"
Seraypheap said he did not care about Bedlow because no one died from that yet, but someone died at Lan Arc. He told defendant he needed to be honest because "this is gonna depend on whether you're gonna go to prison for the rest of your life or just gonna go to prison for a couple of years or couple of months, whatever.... But as of now what I have on you is you're gonna go to prison for the longest time if you don't speak out." Seraypheap said the others were talking. He asked if defendant was one of the shooters and defendant said no. He then asked if defendant was sitting in the front or the back and defendant said in the back next to Rattanak. T-Bird was the driver and Mao the front passenger.
Defendant denied several times that he had a gun. Seraypheap said he had been told defendant was one of the shooters and told him to show his honesty. "The thing is that, you know, I gotta write all these things down. I'm not writing right now, but I will `cause I've gotta give it to the judge, hey, judge, this kid'syou know, he's 16 years old, he can learn from his mistake, you know, help him out here. You know what I mean? You're 16 years old, man. This isthis is a murder. ... This is as serious as it get. It doesn't get any worse than this. All right?"
Defendant continued to deny he had a gun and Seraypheap pressed him to admit it. Seraypheap told him he knew there were two guns in the car, a bigger gun and a smaller gun. People told him defendant had the smaller gun. Seraypheap knew the bigger gun had killed the guy.[3] As Seraypheap pushed defendant to tell him which gun he had because he knew defendant had a gun, the following exchange occurred:
Seraypheap: "You[`ve] never been in trouble before, just for that AAWP. That ain't no big deal, man, you're 16 years old, what can they possibly do to you, if your [] your gun didn't kill those *746 people there? It's not your gun. I been trying to tell you that."
Defendant: "Huh."
Seraypheap: "From the very beginning when I saw you I said, hey, I told you to be honest with everything. Don'tdon't try to cover up, don't try to lie or nothing like that because when you[]when you do things by yourself, yeah, you can lie. I wouldn't know it. But when you are with other people, you can't lie because they will tell the truth. When they start telling[]when they throw in your names, that's when they drag you into this thing. Okay?"
Defendant: "Alright."
Seraypheap: "Thing is don't do that to yourself, man. Justjust tell the truth. You are like my kid. Every time I talk, hey, alright, alright, then you don't want to say nothing. Thing is, you know, you gotta tell the truth. I got kids that are older than you are. I don't want to see my kid in this situation. I don't want to see you in this situation. You know? The thing is that, you know what, it was a mistake and you were young, 16 years old. Okay? I [] I can live with that, you know. But the thing is don't try to cover anything up. Learn from your mistake. That's all I'm telling you."
Defendant: "I learn from my mistake."
Seraypheap: "Yeah, you better learn from your mistake `cause this is a [] this is a big lesson. The biggest lesson of your life. Okay? I[]I[]like again, like I told you thatI been told you had two there were two guns inside that car. Okay? One of them is your's and other's from the other person. I won't mention no name `cause I'm waiting for you to tell me. I already know it. You know? How many rounds did you fire off?"
Defendant admitted he fired one round. Seraypheap asked what kind of gun it was and defendant said a short .38. He thought he fired two rounds. Seraypheap left the room shortly after this admission.
Reyes tried to get defendant to tell him what happened; defendant could not remember any street names unless the detective provided them. Defendant said he did not know the people in the other car. He was not sure what happened. Defendant said he did not point at anyone; he just wanted to scare them. With prompting from Reyes, defendant said the guy in the back of the other car was reaching for something, defendant shot towards him to scare him. Defendant said he threw the gun into the water by UOP. Defendant denied he was concerned about retaliation from ABZ. "No, that day I was stupid, that's why."
The trial court determined there was no Miranda issue as defendant was properly Mirandized. Sleep was not an issue because defendant could have slept in the eight hours he was left alone and he did not appear exhausted. The key issue was voluntariness, which the court took under submission. The court denied the motion, finding the People satisfied the burden of proving by a preponderance of the evidence that the police did not cross the line from proper exhortations to tell the truth to impermissible threats of punishment or promises of leniency. Any implied or express promises were vague and ambiguous. The court stated that if the standard was reasonable doubt, it would have a reasonable doubt whether the officer's statements were the cause of the admissions.
A redacted version of the tape was played for the jury. References to the Bedlow shooting and what defendants' two friends said were redacted.

Discussion
Defendant contends each of his admissions was induced by a promise of leniency. *747 Just before he admitted being in the car, Seraypheap told him the Bedlow incident was not serious because no one died, but Lan Arc was serious because it was a murder. Seraypheap told defendant he was going to prison for the Bedlow incident and what he said would determine "whether you're gonna go to prison "for the rest of your life or just gonna go to prison for a couple of years or couple of months." Defendant was "gonna go to prison for the longest time if you don't speak out." The detective told defendant he would not be tough in prison because there the guys were "huge."
Defendant contends the coercion continued as Seraypheap pressed defendant to admit he had a gun. In the context of repeatedly telling defendant the situation was serious and he was young and should learn from his mistake, Seraypheap falsely told him the smaller gun was not a murder weapon, he would ask the judge to give defendant a break, and, because defendant was only 16, "what can they possibly do to you, if youryour gun didn't kill these people there?"
The Attorney General contends the admissions were not coerced; any promises of help were vague and nonspecific. While admitting Seraypheap falsely told defendant that both Mao and Rattanak had identified him as being in the car when only Rattanak had, and that the .38 was not a murder weapon when it was, he dismisses the effect of these deceptions because they would not have produced an unreliable confession. Defendant had no reason to admit any involvement if he was not there and would not have known the type of guns involved.[4] "Where the deception is not of a type reasonably likely to procure an untrue statement, a finding of involuntariness is unwarranted. [Citation.]" (People v. Farnam (2002) 28 Cal.4th 107, 182, 121 Cal.Rptr.2d 106, 47 P.3d 988.) "The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable. [Citations.]" (People v. Ray (1996) 13 Cal.4th 313, 340, 52 Cal.Rptr.2d 296, 914 P.2d 846.) Finally, the Attorney General contends defendant was motivated to admit his involvement not because of threats or promises of leniency, but because he knew his companions were talking and feared they would make his involvement look worse.
"A defendant's admission or confession challenged as involuntary may not be introduced into evidence at trial unless the prosecution proves by a preponderance of the evidence that it was voluntary. [Citations.] A confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity. [Citations.] On appeal, we review independently the trial court's determination on the ultimate legal issue of voluntariness. [Citation.] But any factual findings by the trial court as to the circumstances surrounding an admission or confession, including `"the characteristics of the accused and the details of the interrogation" [citation],' are subject to review under the deferential substantial evidence standard. [Citation.] [¶] In deciding the question of voluntariness, the United States Supreme Court has directed courts to consider `the totality of circumstances.' [Citations.] Relevant are `the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' [Citation.]" *748 (People v. Williams (1997) 16 Cal.4th 635, 659-660, 66 Cal.Rptr.2d 573, 941 P.2d 752.)
In arguing his admissions were involuntary, defendant relies on the allegedly coercive statements of Seraypheap, the failure to obtain an express Miranda waiver, and his lack of sleep. Substantial evidence from the testimony of the detectives supports the trial court's finding of proper Miranda admonishments and defendant's opportunity for sleep and lack of signs of exhaustion. Thus, we focus on the content of the interrogation and whether there were implied threats or promises of leniency sufficient to render subsequent admissions involuntary.
"It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.]" (People v. Jimenez (1978) 21 Cal.3d 595, 611-612, 147 Cal. Rptr. 172, 580 P.2d 672, overruled on other grounds in People v. Cahill (1993) 5 Cal.4th 478, 510, fn. 17, 20 Cal.Rptr.2d 582, 853 P.2d 1037.) "The line to be drawn between permissible police conduct and conduct deemed to induce or to tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police. Thus, `advice or exhortation by a police officer to an accused to "tell the truth" or that "it would be better to tell the truth" unaccompanied by either a threat or a promise, does not render a subsequent confession involuntary.' [Citation.]" (People v. Hill (1967) 66 Cal.2d 536, 549, 58 Cal.Rptr. 340, 426 P.2d 908.)
"When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature*of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear. [Citations.]" (People v. Hill, supra, 66 Cal.2d at p. 549, 58 Cal.Rptr. 340, 426 P.2d 908.)
We consider each admission separately in determining whether it was the product of coercion. In assessing whether there were false promises of leniency, this court's decision in People v. Cahill (1994) 22 Cal.App.4th 296, 28 Cal.Rptr.2d 1 (Cahill) is instructive.[5] In Cahill defendant was convicted of first degree murder with special circumstances that the murder occurred in the course of a burglary, robbery and rape. (Id. at p. 300, 28 Cal.Rptr.2d 1.) After defendant was Mirandized, the police told him they had all the physical evidence they needed to place him in the victim's house where the murder occurred. An officer told defendant, "`I'm here really to try to see what I can do for you.'" (Id, at p. 305, 28 Cal.Rptr.2d 1.) The officer explained the law of murder in California, describing first degree and second degree murder and voluntary manslaughter, but omitting any reference to felony murder. (Id. at p. 306, 28 Cal.Rptr.2d 1.) This court found the description "materially deceptive." (Id. at p. 315, 28 Cal.Rptr.2d 1.) The officer told defendant he could help *749 himself by talking and suggested that defendant could avoid a first-degree-murder conviction by admitting an unpremeditated role in the killing. (Id. at pp. 306-307, 314-315, 28 Cal.Rptr.2d 1.) We found defendant's subsequent confession was procured by a false promise of leniency, that he could avoid first degree murder by admitting he was inside the house and the killing was not premeditated. (Id. at p. 314, 28 Cal.Rptr.2d 1.) Recognizing the case law that deception was permissible unless reasonably likely to procure an untrue statement, we found these cases did not apply where the deception was a false promise of leniency. (Id. at p. 315, 28 Cal.Rptr.2d 1.)
As to the first challenged statement that defendant was in the Honda, we find no coercion. Seraypheap's discussion of the harsh realities of prison for a slight youth like defendant was simply commenting on the realities of the situation. (In re Gomez (1966) 64 Cal.2d 591, 593-594, 51 Cal.Rptr. 97, 414 P.2d 33 [permissible to "confront petitioner squarely with the predicament he was in"]; People v. Seaton (1983) 146 Cal.App.3d 67, 74, 194 Cal.Rptr. 33.) Telling defendant that what he said would make the difference between life in prison or only a few years or months was not a false promise of leniency. Unlike in Cahill, defendant was not falsely told that one version of events had a significantly lesser consequence. Not every police suggestion that a lesser consequence is available is coercion. In People v. Holloway (2004) 33 Cal.4th 96, 14 Cal.Rptr.3d 212, 91 P.3d 164, while interrogating defendant about two murders, the police suggested the killings might have been accidental or occurred during a blackout and such circumstances could make a lot of difference. The Supreme Court found no promises of lenient treatment in exchange for cooperation. No particular benefit was offered and it is true there are varying degrees of homicide depending on the circumstances. (Id at p. 116, 14 Cal.Rptr.3d 212, 91 P.3d 164.)
We reach a different conclusion as to defendant's admission he fired a .38. Just before this admission Seraypheap repeatedly emphasized defendant's young age, the seriousness of the situation, and that he should learn from his mistake. The detective urged defendant to admit he had the smaller gun, assuring him it was not the murder weapon and asking, "what can they possibly do to you, if youryour gun didn't kill these people there?" Seraypheap's statements were both factually and legally false. Both known guns were murder weapons and the law of aiding and abetting does not require one to be the actual shooter to be convicted of murder. (See, e.g., People v. Vasco (2005) 131 Cal. App.4th 137, 160-162, 31 Cal.Rptr.3d 643.)
In addition, Seraypheap told defendant he would write the judge and urge him to "help [defendant] out here." He compared defendant to his son and reasoned that if defendant was young and made a mistake, "I can live with that," as long as defendant did not cover it up. We recognize that simply telling a defendant that the police will advise the district attorney of defendant's cooperation is not a promise of leniency. (People v. Boyde (1988) 46 Cal.3d 212, 239, 250 Cal.Rptr. 83, 758 P.2d 25 [officer repeatedly told defendant he had no authority to make a promise of leniency, but could only pass information to the district attorney]; People v. Ramos (2004) 121 Cal.App.4th 1194, 1203, 18 Cal.Rptr.3d 167 [officer told defendant he would bring defendant's statements to the district attorney's office for consideration].) Here, however, Seraypheap did more than offer intercession that might be useful in plea bargain negotiations (ibid.); *750 Seraypheap offered to advocate for defendant before the judge.
In effect, Seraypheap falsely promised defendant more lenient treatment in a murder casea chance to learn from his mistakeif he cooperated and admitted he had the smaller gun. This promise is similar to, although not as specific as, telling the defendant in Cahill he would not face first degree murder if he admitted an unpremeditated killing.
This case has striking similarities to In re Shawn D. (1993) 20 Cal.App.4th 200, 216, 24 Cal.Rptr.2d 395, in which the court found "[t]he promise of leniency in exchange for a confession permeated the entire interrogation." In questioning an unsophisticated 16-year-old about a burglary, the police told the minor the truth would be noted in the police report, as would a lie. The police told him he was putting his pregnant girlfriend in a precarious situation and he needed to admit his mistakes and start a new life. If the minor stopped lying, he would get to see his girlfriend and baby. (Id. at pp. 204-205, 24 Cal.Rptr.2d 395.) Using a parable of "tough talk," the police compared the minor's situation to dropping a wedding ring in a toilet, and urged him to reach in and get the ring rather than to keep lying. Explaining the law, the officer posed the hypothetical of the get-away driver in a bank robbery; he would be in trouble for robbing the bank, but if he explained his participation, it could make a difference. (Id. at p. 205, 24 Cal.Rptr.2d 395.) The officer told the minor if he helped them recover the stolen property, he would personally talk to the district attorney. (Id. at p. 207, 24 Cal.Rptr.2d 395.)
The reviewing court found the officer's lies to the minor, the implied threat in references to San Quentin, and the tough talk of the parable and possible benefit to his girlfriend, troubling but probably insufficient to make the confession involuntary. (In re Shawn D., supra, 20 Cal.App.4th at p. 213, 24 Cal.Rptr.2d 395.) It found the confession involuntary due to the repeated suggestions that the minor would be treated more leniently if he confessed. The minor was told his honesty or his lies would be noted on the police report and the report would reflect whether he was cooperative. The officer implied the minor would go to jail if he continued to lie, but would get to see his girlfriend and baby if he stopped lying. (Id. at p. 214, 24 Cal. Rptr.2d 395.) The hypothetical about the bank robbery suggested leniency for explaining his role, and the officer promised to personally speak to the district attorney if the minor helped them "`get the stuff back.'" (Id. at p. 215, 24 Cal.Rptr.2d 395.)
In People v. Johnson (1969) 70 Cal.2d 469, 74 Cal.Rptr. 889, 450 P.2d 265, a shooting occurred at a gas station. The police told defendant his companions accused him of the killing, there was a first-degree-murder conviction for which he could get the gas chamber, no one would believe him because he denied everything, if they were jury they would give him the gas chamber, it would be better to go into the courtroom in the best light, and denying everything showed malice and hatred or just a senseless killing of a white man. (Id. at p. 478, 74 Cal.Rptr. 889, 450 P.2d 265.) The court found defendant's admission involuntary because it was motivated by promises of leniency or advantage. "To someone unskilled and uncounseled in the law it might have offered a hope that since no money was taken in the robbery and if, as he claimed he did not do the shooting, that he might be cleared of any serious charges." (Id. at p. 479, 74 Cal.Rptr. 889, 450 P.2d 265.) In this case, to the young and immature defendant, Seraypheap's paternal and solicitous exhortations to learn from his mistake and admit he had a gun *751 because he was not the killer might have "offered hope" to avoid the most serious charges. As in Cahill, we find "the interrogation in this case was over the line and amounted to a promise of leniency." (Cahill, supra, 22 Cal.App.4th at p. 316, 28 Cal.Rptr.2d 1.)
The implied promise of leniency must be "a motivating cause of the confession[.]" (People v. Johnson, supra, 70 Cal.2d 469, 478, 74 Cal.Rptr. 889, 450 P.2d 265.) "Where the dominant focus of an interrogation is an implied promise of leniency and a confession ensues, absent adduction of countervailing evidence, e.g., a substantial time lapse between the implied promise and the incriminating statements, the confession must be attributed to that implied promise. [Citation.]" (Cahill, supra 22 Cal.App.4th at p. 316, 28 Cal.Rptr.2d 1.) The Attorney General contends defendant's admission was motivated by fear of what his companions would say about his role in the crime, not any promise of leniency. Defendant, however, admitted he fired a .38 immediately after Seraypheap pressed him to learn from his mistake, told him the smaller gun was not the murder weapon, and questioned how harsh the consequence could be for a 16-year-old who had not killed anyone. There was no substantial time lapse or other countervailing evidence to attribute the confession to anything other than the implied promise of leniency if defendant admitted he had the smaller gun.
The trial court erred in admitting into evidence defendant's second admission that he fired a gun.
The erroneous admission of an involuntary confession is subject to the federal harmless-beyond-a-reasonable-doubt standard of Chapman v. California (1967) 386 U.S. 18, 23, 87 S.Ct. 824, 827-28, 17 L.Ed.2d 705, 710. (People v. Cahill, supra, 5 Cal.4th 478, 509-510, 20 Cal. Rptr.2d 582, 853 P.2d 1037.) In assessing prejudice, we note first that defendant asserts the jury rejected his admission that he fired a gun because it found he did not personally use a firearm and acquitted him of shooting at or from a motor vehicle. Regardless of what the jurors believed as to defendant's second statement, this is not a case where "honest, fair-minded jurors might very well have brought in not-guilty verdicts" as to murder and street terrorism in the absence of defendant's second statement. (Chapman v. California, supra, 386 U.S. at p. 26, 87 S.Ct. at p. 829, 17 L.Ed.2d at p. 711.) There was ample, indeed overwhelming, evidence that defendant was a TRG member and that TRG was a violent street gang. Considerable indicia of gang membership was found in his bedroom and he admitted as much by carving "TRG" on his cafeteria tray and door while in custody and threatening a supervisor, claiming "this is TRG." That he was guilty of murder was almost as indisputable. Defendant was one of three or four persons in the car and three guns were used to fire several shots. The driver was identified as Rathana Chan or T-Bird, a known TRG member. The shooting was gang-related and defendant was a member of the gang. He professed solidarity not only with the gang, but with its violent methods: "One to the dome. This is how we do it." The admission of defendant's second statement that he fired a gun was harmless beyond a reasonable doubt as a pure evidentiary matter. However, as we next discuss, it contributed to the error of instructing the jury on second degree felony murder.

II. Instruction on Second Degree Felony Murder
At the prosecution's request, the trial court instructed the jury on second degree felony murder and aiding and abetting second *752 degree felony murder.[6] It was the only theory of murder presented to the jury that was explicitly second degree.[7] The jury was instructed that murder was an unlawful killing "done with malice aforethought or occurred during the commission or attempted commission of shooting at an occupied motor vehicle, Section 246 of the Penal Code, a felony, inherently dangerous to human life."
Defendant contends it was error to instruct on the felony-murder doctrine in this case due to the merger rule of People v. Ireland (1969) 70 Cal.2d 522, 75 Cal. Rptr. 188, 450 P.2d 580. Defendant argues that in this case there is nothing to distinguish the crimes of assault and shooting at an occupied vehicle and since the former crime merges with murder under Ireland, thus precluding application of the felony-murder doctrine, the latter crime should as well.
We begin our analysis with a brief review of second degree felony murder and the merger doctrine. Although the second degree felony-murder doctrine has been a part of California law for many decades, there is no statutory definition for second degree felony murder. (People v. Patterson (1989) 49 Cal.3d 615, 620-621, 262 Cal.Rptr. 195, 778 P.2d 549.) "A homicide that is a direct causal result of the commission of a felony inherently dangerous to human life (other than the six felonies enumerated in Pen.Code, § 189) constitutes at least second degree murder. [Citations.]" (People v. Ford (1964) 60 Cal.2d 772, 795, 36 Cal.Rptr. 620, 388 P.2d 892.)
"The felony-murder rule operates (1) to posit the existence of malice aforethought in homicides which are the direct causal result of the perpetration or attempted perpetration of all felonies inherently dangerous to human life, and (2) to posit the existence of malice aforethought and to classify the offense as murder of the first degree in homicides which are the direct causal result of those six felonies specifically enumerated in section 189 of the Penal Code. [Citations.]" (People v. *753 Ireland, supra, 70 Cal.2d 522, 538, 75 Cal. Rptr. 188, 450 P.2d 580.) The Legislature has taken no action to alter this judicially-created rule and has declined suggestions by the Supreme Court to reconsider the rules of felony murder. (People v. Patterson, supra, 49 Cal.3d at p. 621, 262 Cal. Rptr. 195, 778 P.2d 549.)
In People v. Ireland, supra, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580, defendant, after taking medication and drinking two mugs of wine, shot his wife, with whom he had serious marital difficulties. On appeal, he contended it was error to instruct on second degree felony murder, with assault with a deadly weapon as the inherently dangerous felony. The Supreme Court agreed and adopted the merger rule in California. "We have concluded that the utilization of the felony-murder rule in circumstances such as those before us extends the operation of that rule `beyond any rational function that it is designed to serve.' [Citation.] To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assaulta category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included in fact within the offense charged." (Id. at p. 539, 75 Cal.Rptr. 188, 450 P.2d 580, fn. omitted, original italics.) In a footnote, the court clarified that an offense may be included in fact even though it is not a lesser included offense. (Id. at p. 540, fn. 14, 75 Cal.Rptr. 188, 450 P.2d 580.)
In People v. Mattison (1971) 4 Cal.3d 177, 93 Cal.Rptr. 185, 481 P.2d 193, defendant, a prison inmate, was convicted of the second degree murder of another inmate who died from methyl alcohol poisoning after drinking alcohol supplied by defendant. Defendant contended the conviction was legally impossible as murder by poison was first degree murder. (Id. at p. 180, 93 Cal.Rptr. 185, 481 P.2d 193.) He contended second degree felony murder was barred by the merger rule; the offense of administering poison with intent to injure was an "`integral part of'" and "`included in fact within the offense'" of murder by poison. (Id. at p. 185, 93 Cal.Rptr. 185, 481 P.2d 193.)
The Supreme Court disagreed, adopting the test used in People v. Taylor (1970) 11 Cal.App.3d 57, 89 Cal.Rptr. 697, in which the victim died from an overdose of heroin furnished by defendant. After reviewing the cases whose reasoning was adopted in Ireland, supra, 70 Cal.2d 522, 75 Cal.Rptr. 188, 450 P.2d 580, "the Taylor court concluded that application of the felony-murder rule was proper because the underlying felony was committed with a `collateral and independent felonious design.' [Citation.] In other words the felony was not done with the intent to commit injury which would cause death. Giving a felony-murder instruction in such a situation serves rather than subverts the purpose of the rule." (People v. Mattison, supra, 4 Cal.3d at p. 185, 93 Cal.Rptr. 185, 481 P.2d 193.) While the felony-murder rule could not be considered a deterrent to one who has decided to assault his victim with a deadly weapon, it could have a deterrent effect on a defendant's readiness to furnish a dangerous substance. (Ibid.)
The Supreme Court reconsidered second degree felony murder and the merger rule in People v. Hansen (1994) 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022 (Hansen). *754 In Hansen, defendant fired into an apartment, killing a child, after his money was taken in an abortive drug deal; he admitted the shooting, but denied intending to harm anyone. (Id. at pp. 305-306, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) On appeal, he contended it was error to instruct on second degree felony murder due to the merger rule, relying on People v. Wesley (1970) 10 Cal.App.3d 902, 905-908, 89 Cal.Rptr. 377,[8] which held shooting at an occupied dwelling (Pen.Code, § 246) was an integral part of the homicide and, under the prosecution's evidence, an offense included in fact within the homicide. (Hansen, supra, 9 Cal.4th at p. 307, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
The high court agreed with Taylor's definition of the scope of the Ireland rule, but declined to adopt the "collateral and independent felonious design" language as the critical test of merger in all cases. (Hansen, supra, 9 Cal.4th at pp. 314-315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) Rather, the court focused "upon the principles and rationale underlying the foregoing language in Taylor, namely, that with respect to certain inherently dangerous felonies, their use as the predicate felony supporting application of the felony-murder rule will not elevate all felonious assaults to murder or otherwise subvert the legislative intent." (Id. at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) Since "[m]ost homicides do not result from violations of section 246, ... application of the felony-murder doctrine in the present context will not have the effect of `precluding] the jury from considering the issue of malice aforethought ... [in] the great majority of all homicides.' [Citation.]" (Ibid.)
It is unclear whether the Hansen court found applying the felony-murder doctrine to shooting at an inhabited dwelling did not subvert the legislative intent because that crime was not necessarily an assault since the dwelling had only to be inhabited, not occupied, or whether the felony-murder doctrine could be applied to any subset of assaults so long as the subset did not include "the great majority of all homicides."
Finding Hansen, supra, 9 Cal.4th 300, 36 Cal.Rptr.2d 609, 885 P.2d 1022 controlling, this court, in People v. Tabios (1998) 67 Cal.App.4th 1, at page 11, 78 Cal. Rptr.2d 753, held the merger rule did not apply to a violation of Penal Code section 246 involving discharge of a firearm into an occupied vehicle, the underlying felony in this case. If the law on second degree felony murder stopped here, we might have to conclude the instruction was proper, even though the act of shooting into an occupied vehicle contains all the elements of assault, that is, "an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (People v. Williams (2001) 26 Cal.4th 779, 790, 111 Cal.Rptr.2d 114, 29 P.3d 197.)
The Supreme Court, however, returned to the Mattison collateral purpose rationale in People v. Robertson (2004) 34 Cal.4th 156, 17 Cal.Rptr.3d 604, 95 P.3d 872 (Robertson). In Robertson, defendant heard men stealing the hubcaps from his car and went outside with a gun and fired shots, killing one and wounding another. Defendant claimed he held the gun at a 45-degree angle and fired warning shots to scare the thieves; the forensic evidence tended to disprove this claim. (Id. at pp. 161-162, 17 Cal.Rptr.3d 604, 95 P.3d 872.) *755 A jury convicted defendant of second degree murder and assault with a deadly weapon. Defendant challenged the instruction on second degree felony murder based upon the predicate felony of discharging a firearm in a grossly negligent manner. (Id. at p. 169, 17 Cal.Rptr.3d 604, 95 P.3d 872.)
Focusing on the deterrent purpose of the felony-murder rule, the court found application of second degree felony murder "was appropriate when the purpose of the predicate felony was independent of or collateral to an intent to cause injury that would result in death." (Robertson, supra, 34 Cal.4th at p. 171, 17 Cal.Rptr.3d 604, 95 P.3d 872.) Although one who decides to assault another would not be deterred by the felony-murder rule, a defendant with a collateral purpose may be deterred. (Ibid.) Although the collateral purpose rationale had drawbacks in some situations, "we believe it provides the most appropriate framework to determine whether, under the facts of the present case, the trial court properly instructed the jury." (Ibid.) Defendant's stated purpose was to frighten, a collateral purpose rendering the challenged instruction permissible. (Ibid.)
Second degree felony murder predicated on negligent discharge of a firearm was again before the court in People v. Randle (2005) 35 Cal.4th 987, 28 Cal.Rptr.3d 725, 111 P.3d 987 (Randle). In Randle, defendant and his cousin stole some stereo equipment from a car and fired when the owners approached. The owners pursued them, caught the cousin and beat him. Defendant fired at the victim to make him stop beating the cousin and killed him. (Id at pp. 991-992, 28 Cal.Rptr.3d 725, 111 P.3d 987.) The Supreme Court found prejudicial error in failing to instruct on imperfect defense of others. (Id. at pp. 994-1004, 28 Cal.Rptr.3d 725, 111 P.3d 987.) It then considered whether it was proper to instruct on second degree felony murder and found it was not. The court distinguished Robertson because defendant admitted firing at his victim rather than in the air. His claim that he fired to rescue his cousin was only the motive for the shooting, not an independent purpose. (Id at pp. 1004-1005, 28 Cal.Rptr.3d 725, 111 P.3d 987.)
Recently, in People v. Bejarano (2007) 149 Cal.App.4th 975, 57 Cal.Rptr.3d 486 (Bejarano), the court held the merger doctrine applied where the predicate felony was discharging a firearm at an occupied vehicle (Pen.Code, § 246). Defendant shot at the occupants of an Oldsmobile who were rival gang members and hit a third person in another car. The court found defendant admitted he intentionally shot at the occupants of the Oldsmobile and thus had no collateral purpose. This admission of assault distinguished Robertson and made Randle controlling. (Bejarano, supra, at p. 990, 57 Cal.Rptr.3d 486.) "The felony-murder rule can hardly be much of a deterrent to a defendant who has decided to discharge a firearm at an occupied motor vehicle solely with an intent to thereby assault the occupants." (Ibid.)
From this muddled state of the law, we discern the rule to be that second degree felony murder is applicable to an assaultive-type crime, such as when shooting at a person is involved, provided the crime was committed with a purpose independent of and collateral to causing injury. Since the Supreme Court could have upheld instruction on felony murder in Randle on the basis that most homicides are not committed by negligently discharging a gun and did not, we conclude the collateral purpose rule is the proper test of merger in these types of cases.
*756 In this case, the parties dispute whether defendant had a collateral purpose. The Attorney General cites portions of defendant's statement that he "just wanted to scare them" and contends the case is like Robertson, supra, 34 Cal.4th 156, 17 Cal.Rptr.3d 604, 95 P.3d 872. Defendant relies on his statement that he fired towards the man in the backseat and argues Randle, supra, 35 Cal.4th 987, 28 Cal.Rptr.3d 725, 111 P.3d 987 controls. Both of these statements came after defendant admitted he fired a gun. We have concluded this portion of his statement should have been excluded because it was procured by false promises of leniency. Without defendant's statements about firing the gun, there was no admissible evidence of a collateral purpose by defendant or any of his companions. Indeed, the reasonable inference is that one who shoots another at close range intends to harm, if not to kill. (See, e.g., People v. Vang (2001) 87 Cal.App.4th 554, 563-565, 104 Cal.Rptr.2d 704.) The Supreme Court has emphasized the deterrent purpose of the felony-murder rule, but has recognized it will not deter a defendant who has decided to assault his victim with a deadly weapon. (Robertson, supra, 34 Cal.4th at p. 171l, 17 Cal.Rptr.3d 604, 95 P.3d 872; People v. Mattison, supra, 4 Cal.3d at p. 185, 93 Cal.Rptr. 185, 481 P.2d 193.) Here, the admissible evidence shows defendant had made that decision.
Absent evidence of a collateral purpose, it was error to instruct on second degree felony murder. Since the facts did not state second degree felony murder and since the record does not show the murder conviction was based on a valid ground, we reverse the conviction for second degree murder. (People v. Guiton, supra, 4 Cal.4th 1116, 1129, 17 Cal.Rptr.2d 365, 847 P.2d 45.)

III. Victim Restitution
Defendant contends the trial court erred in imposing direct restitution of $65,091.30 over defense objection. Although there was no hearing on the restitution award, the record indicates a significant portion of it was for medial expenses incurred by Judy Onesavanh, and possibly some expenses incurred by Sophal Ouch. Defendant asserts he is liable only for damage caused by crimes of which he was convicted. (People v. Percelle (2005) 126 Cal.App.4th 164, 180, 23 Cal.Rptr.3d 731 (Percelle).) He contends that since he was acquitted of the crimes of which Onesavanh and Ouch were the victims, any restitution for their losses was unauthorized. Because the losses of Onesavanh and Ouch were related to defendant's conviction for street terrorism, we disagree.
"It is the unequivocal intention of the People of the State of California that all persons who suffer losses as a result of criminal activity shall have the right to restitution from the persons convicted of the crimes for losses they suffer." (Cal. Const., art. I, § 28(d).) The Legislature has affirmed this intent, providing in Penal Code section 1202.4, subdivision (a) that a "victim of crime who incurs any economic loss as a result of the commission of a crime shall receive restitution directly from any defendant convicted of that crime." The court must order defendant to make victim restitution in every case in which a victim suffers economic loss due to defendant's conduct. (Pen.Code, § 1202.4, subd. (f).)
While a court may impose victim restitution as a condition of probation regardless of whether defendant has been convicted of the underlying crime, the rule is different where defendant does not receive probation. (Percelle, supra, 126 Cal. App.4th at pp. 179-180, 23 Cal.Rptr.3d 731.) In Percelle, the court ordered restitution *757 to the victim of a theft of which defendant was acquitted. Focusing on the language of Penal Code section 1202.4, subdivision (a), the court held the restitution order was unauthorized because defendant was not convicted of that crime. (Id, at p. 180, 23 Cal.Rptr.3d 731.) The losses included in the restitution order were not connected to defendant; there was no evidence the unauthorized charges to the victim's credit card were the result of any crime of which defendant was convicted. (Id. at p. 181, 23 Cal.Rptr.3d 731.)
The Percelle court did not find an acquittal precluded restitution in all circumstances. "We merely hold that in the non-probation context, a restitution order is not authorized where the defendant's only relationship to the victim's loss is by way of a crime of which the defendant was acquitted." (Percelle, supra, 126 Cal. App.4th 164, 180, 23 Cal.Rptr.3d 731, italics added.) That is not the situation here. Defendant was convicted of street terrorism based on the shooting.[9] That crime provides the relationship between defendant and the losses incurred by Onesavanh and Ouch. The restitution order was authorized.

DISPOSITION
The judgment of conviction for second degree murder is reversed and the cause remanded for retrial on that count. In all other respects the judgment is affirmed.
I concur: BLEASE, Acting P.J.
NICHOLSON, J., Concurring and Dissenting.
As to parts I and III of the majority opinion, I concur in the result. As to part II, reversing the second degree murder conviction, I respectfully dissent.
The majority laments that second degree felony murder and the merger doctrine, as a result of several California Supreme Court decisions, present a "muddled state of the law." (Maj. opn. at p. 755.) With that proposition, I agree. However, unlike the majority, I cannot so easily discredit the Supreme Court's 1994 holding that a violation of Penal Code section 246 [10] does not merge with a resulting homicide. (People v. Hansen (1994) 9 Cal.4th 300, 311-316, 36 Cal.Rptr.2d 609, 885 P.2d 1022 (Hansen).)
In Hansen, the defendant shot at an inhabited building, a violation of section 246, and in doing so caused the death of a child inside the house. Since (1) the purpose of the merger doctrine is to avoid subverting legislative intent, which would be subverted if all felonious assaults were elevated to murder, and (2) "[m]ost homicides do not result from violations of section 246" (Hansen, supra, at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022), the purpose of the merger doctrine is not served by applying it to violations of section 246. "Indeed, ... application of the felony-murder rule, when a violation of section 246 results in the death of a person, clearly is consistent with the traditionally recognized purpose of the second degree felony-murder doctrinenamely the deterrence of negligent or accidental killings that occur in the course of the commission of dangerous felonies." (Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d *758 1022.) The Hansen court rejected the notion that it was necessary to find that the defendant committed the violation of section 246 with a collateral and independent design "as the critical test determinative of merger in all cases ...," thus disapproving, at least for some circumstances, its own adoption of the collateral purpose rationale in an earlier case. (Hansen, supra, at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.)
We relied on this moment of clarity from the Supreme Court in deciding People v. Tabios (1998) 67 Cal.App.4th 1, 78 Cal. Rptr.2d 753 (Tabios). In Tabios, the defendant violated section 246 by shooting at an occupied vehicle. His shot hit and killed one of the occupants. Responding to the argument that a violation of section 246 merges with the resulting homicide, we cited and quoted Hansen and found no merger, based on Hansen's rationale that applying the second degree felony-murder rule to a homicide resulting from a violation of section 246 does not subvert the Legislature's intent concerning gradations of homicide by elevating all felonious assaults to murder. (Tabios, supra, 67 Cal. App.4th at p. 11, 78 Cal.Rptr.2d 753.)
In 2004 and again in 2005, the Supreme Court revisited the merger doctrine. (People v. Robertson (2004) 34 Cal.4th 156, 17 Cal.Rptr.3d 604, 95 P.3d 872 (Robertson ); People v. Randle (2005) 35 Cal.4th 987, 28 Cal.Rptr.3d 725, 111 P.3d 987 (Randle).) Both of those cases involved a violation of section 246.3, discharge of a firearm in a grossly negligent manner. In those cases, the court applied its collateral purpose rationale and held that, if a violation of section 246.3 results in a homicide, the violation of section 246.3 merges with murder unless the defendant had a collateral and independent felonious design. (Robertson, supra, at p. 171, 17 Cal. Rptr.3d 604, 95 P.3d 872; Randle, supra, at p. 1005, 28 Cal.Rptr.3d 725, 111 P.3d 987.) In Robertson, merger did not apply because the court found that the defendant had the collateral purpose of frightening away the person he shot (Robertson, supra, at p. 171, 17 Cal.Rptr.3d 604, 95 P.3d 872), while in Randle the court found no collateral purpose in the defendant's shooting at the victim (Randle, supra, at p. 1005, 28 Cal.Rptr.3d 725, 111 P.3d 987).
The problem with seeking doctrinal purity in the application of the merger doctrine is that the Supreme Court has now set forth seemingly conflicting tests. Is the test whether application of the felony-murder rule would subvert legislative intent by elevating all assaults to murder? Or is it whether the defendant acted with a collateral and independent felonious design?
Extending Robertson and Randle beyond section 246.3 to all "assaultive-type crime," the majority concludes that the merger rule is applicable unless "the crime was committed with a purpose independent of and collateral to causing injury." (Maj. opn. at p. 755; see also People v. Bejarano (2007) 149 Cal.App.4th 975, 57 Cal.Rptr.3d 486.) Without saying so, therefore, the majority concludes that Hansen has been overruled. By what, I wonder. Nowhere in Hansen did the court state that its holding was based on the fact that the defendant did not know there were children in the house he shot up. To the contrary, the court based its holding solely on the fact that applying the second degree felony-murder rule to a violation of section 246 does not subvert legislative intent. To me, the only rule that can be gleaned from Robertson and Randle is that the collateral purpose rationale applies to cases involving a violation of section 246.3, which this case does not.
The Supreme Court still cites Hansen as viable authority. In Robertson, the court *759 stated: "Although the collateral purpose rationale may have its drawbacks in some situations (Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022), we believe it provides the most appropriate framework to determine whether, under the facts of the present case, the trial court properly instructed the jury." (Robertson, supra, 34 Cal.4th at p. 171, 17 Cal.Rptr.3d 604, 95 P.3d 872, italics added.) There are two problems with this sentence. First, Hansen is not authority for the statement that "the collateral purpose rationale may have its drawbacks in some situations." Hansen rejected the collateral purpose rationale as being applicable to "all cases" and found it was not applicable to a violation of section 246. (Hansen, supra, 9 Cal.4th at p. 315, 36 Cal.Rptr.2d 609, 885 P.2d 1022.) And second, the court, in the sentence quoted from Robertson, states that it believes the collateral purpose rationale is the most appropriate framework for determining the applicability of merger under the facts of that case. It does not reveal to us why the collateral purpose rationale is applicable to the Robertson facts but not to the Hansen facts.
So are we to apply the merger doctrine whenever there is assaultive conduct, as the majority would do, if there is no collateral and independent felonious design? No. As the Supreme Court stated, the collateral purpose rationale has its drawbacks. What those drawbacks are, we are not told, but it is clear that the court has not extended that rationale to violations of section 246. Therefore, I disagree with the majority's analysis and would hold, instead, that merger is inappropriate when the underlying offense is a violation of section 246.
NOTES
[1] The Attorney General concedes the street terrorism enhancement was unauthorized. (People v. Lopez (2005) 34 Cal.4th 1002, 1007, 1010-1011, 22 Cal.Rptr.3d 869, 103 P.3d 270.)
[2] The prosecutor argued defendant was called Snub because his weapon of choice was a snub-nosed .38.
[3] At the time of this interview, the police only knew about the .38 and the .44, not the .22. A .38 bullet was removed from Onethavong's head during the autopsy.
[4] Defendant claimed he heard rumors about the shooting, including that a .38 was used.
[5] Although defendant relied heavily on Cahill, supra, 22 Cal.App.4th 296, 28 Cal.Rptr.2d 1 in his opening brief, the Attorney General did not discuss the case.
[6] The jury was instructed: "The unlawful killing of a human being whether intentional, unintentional or accidental, which occurs as the direct causal result of the commission or attempted commission of the crime of shooting at an occupied motor vehicle is murder of the second degree when the perpetrator had the specific intent to commit that crime."

The jury was further instructed: "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of shooting at an occupied motor vehicle, a felony inherently dangerous to human life, all persons who either directly and actively commit the act constituting that crime or who, with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging or facilitating the commission of the offense, aid, promote, encourage or instigate by act or advice its commission are guilty of murder of the second degree, whether the killing is intentional, unintentional or accidental."
[7] The jury was instructed on the definitions of express and implied malice, without a distinction between first and second degree murder. The court instructed on various forms of first degree murder, but did not give CALJIC No. 8.30 on second degree express malice murder or CALJIC No. 8.31 on second degree implied malice murder. The court also instructed on the liability of an aider and abettor for the natural and probable consequences of the crime aided and abetted and that murder and attempted murder were natural and probable consequences of the crimes shooting at an occupied vehicle, and discharging a firearm from a vehicle. This instruction did not mention the degree of murder. While it is possible the jury selected second degree murder on another theory after finding no premeditation and deliberation, we cannot determine which theory the jury relied on, so if the second degree felony-murder instruction was legally flawed, the verdict must be reversed. (People v. Guiton (1993) 4 Cal.4th 1116, 1129, 17 Cal.Rptr.2d 365, 847 P.2d 45.)
[8] People v. Wesley was overruled in Hansen, supra, 9 Cal.4th at page 316, 36 Cal.Rptr.2d 609, 885 P.2d 1022.
[9] The trial court stayed the two-year sentence on the street terrorism count pursuant to Penal Code section 654, finding it "was the same operative facts" as the gang allegation. The abstract of judgment incorrectly shows the sentence as concurrent. The abstract should be corrected, as appropriate, after retrial.
[10] Further code citations, though unspecified, are to the Penal Code.