[Crim. No. 11989. Third Dist. Aug. 16, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
CURTIS LEE SEATON, Defendant and Appellant.

**COUNSEL**

Charles J. Leoni, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and Jane Kirkland Fischer, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BOND, J.**[*]—Following our affirmance of the judgment of conviction the Supreme Court granted a hearing and thereafter retransferred the cause to this court for reconsideration in light of *People* v. *Crowson* (1983) 33 Cal.3d 623 [190 Cal.Rptr. 165, 660 P.2d 389]. As directed we have reexamined our decision and again conclude that the judgment should be affirmed. Accordingly we reiterate our opinion with appropriate references to *Crowson*.

After a trial by jury, defendant was found guilty of receiving stolen property (Pen. Code, § 496), of grand theft (Pen. Code, § 487, subd. 1) and of conspiracy to shoot at an inhabited building (Pen. Code, §§ 182, 246).[1]

---

[*]Assigned by the Chairperson of the Judicial Council.

[1]The jury found him not guilty on another count of receiving stolen property (Pen. Code, § 496) and not guilty of two counts of shooting at an inhabited dwelling (Pen. Code, § 246).

On appeal from the judgment, defendant contends: (1) his purported waiver of Miranda[2] rights and ensuing confessions were involuntary; (2) the prosecutor had a duty to guard against inadmissible statements from his witnesses and was guilty of misconduct warranting a mistrial when he violated that duty; (3) an adult conviction which resulted in defendant's sentence to the California Youth Authority could not be used to impeach him after he had been physically discharged from that institution; and (4) the secret recording of defendant's conversation while in the back of a patrol car violated Penal Code section 2600 or his right to privacy guaranteed by article I, section 1, of the California Constitution.

## FACTS

While on patrol at about 4:18 a.m. on September 28, 1981, Officer Ortiz heard what he believed to be gunshots; he heard a radio dispatch indicating shots had been fired at Cirby Way and Wildwood and the suspect vehicle was a dark-colored Ranchero or El Camino-type vehicle. The officer talked to the clerk of the 7-Eleven store on that corner, who described the shots and vehicle. Ortiz then went to an apartment building behind the 7-Eleven where residents of two apartments indicated someone had shot into their apartments. A dog had been shot and was lying dead on a chair next to one apartment. Officer Ortiz saw a black Ranchero drive by with defendant in the car; he told Sergeant Hughes he thought it was the suspect vehicle and Hughes drove off in the direction the Ranchero had gone. The 7-Eleven clerk pointed to the Ranchero and told Ortiz, " 'There it goes.' " Ortiz radioed Hughes that the Ranchero was the vehicle and proceeded to where Hughes had stopped the Ranchero. After the vehicle's occupants had exited, Ortiz observed through the open door an unfired shotgun shell which matched those collected at the apartment building; he also observed the barrel of a shotgun. Defendant and another man were placed under arrest for firing into an occupied dwelling. They were placed in the back of the patrol vehicle and a tape recorder was activated. Based on this recorded conversation, search warrants were obtained and evidence was seized that was used against defendant. Defendant was interviewed by Officer Neves at the Roseville City jail on September 28, 29 and 30.

## I

 ██ ██ Although defendant testified he understood the waiver of his Miranda rights, he contends the waiver and ensuing confession

---

[2]Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.2d 974].

were involuntary.[3] He bases this contention on his testimony that, before reading him his *Miranda* rights, Officer Neves reminded him he was "on CYA parole hold and that it would benefit in a way if I would talk . . . . [¶] That if I didn't talk to him or if I was found not guilty of a crime, that I could do six months to a year in CYA." Neves allegedly told defendant that if he was helpful Neves might be able to talk to CYA. Defendant contends the reminder regarding the California Youth Authority was both an implied threat that, unless he waived his rights and made a statement, the California Youth Authority would incarcerate him no matter what the outcome was on the pending charges, and an implied promise that if he made a statement it would benefit him in the eyes of the Youth Authority. He argues there is ample and reasonable ground for doubting whether a suspect who has been held incommunicado from his parents, friends and attorney in a jail cell for 10 hours and is reminded by a police officer that he is on California Youth Authority parole possessed either a rational intellect or a free will.[4]

"It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.]" (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 611 [147 Cal.Rptr. 172, 580 P.2d 672]; *People* v. *Johnson* (1969) 70 Cal.2d 469, 479 [74 Cal.Rptr. 889, 450 P.2d 265].) The trial court found beyond a reasonable doubt defendant gave the statement voluntarily without promise of reward or immunity, either implied or express. In reviewing that determination, it is our duty to examine the uncontradicted facts " 'to determine independently whether the trial court's conclusion of voluntariness was properly found.' [Citation.]" (*People* v. *Thompson* (1980) 27 Cal.3d 303, 327 [165 Cal.Rptr. 289, 611 P.2d 883]; *People* v. *Jimenez, supra,* 21 Cal.3d at p. 609.) We recognize the burden is on the prosecution to show the confession was voluntarily given without previous inducement, intimidation or threat. (*Ibid.*) However, with respect to conflicting testimony,

---

[3]For purposes of the issue of voluntariness, we need not determine whether these statements constituted confessions or admissions since in either case the burden to prove voluntariness beyond a reasonable doubt was on the prosecution and since either confessions or admissions obtained without a valid waiver of *Miranda* rights are deemed to have been coerced. (*People* v. *Murtishaw* (1981) 29 Cal.3d 733, 753 [175 Cal.Rptr. 738, 631 P.2d 446]; *People* v. *Jimenez* (1978) 21 Cal.3d 595, 604-608 [147 Cal.Rptr. 172, 580 P.2d 672] [confession]; *People* v. *Alfieri* (1979) 95 Cal.App.3d 533, 542 [157 Cal.Rptr. 304]; *People* v. *Daniels* (1969) 1 Cal.App.3d 367, 373-374 [81 Cal.Rptr. 675].)

[4]Defendant mentions but does not otherwise discuss the timing or purported lack of communication; we conclude these factors did not render his confession involuntary. There is nothing in the record to indicate defendant had been deprived of sleep during this time or that he was not alert. Although defendant testified he had not had the opportunity to communicate with those persons, there is nothing in the record to indicate he was held incommunicado by police.

" '. . . we accept that version of events which is most favorable to the People, to the extent that it is supported by the record.' [Citations.]" (*Ibid.*)

██ That version of events indicates Officer Neves did discuss the fact defendant was on parole and that a parole hold had been placed, but that the discussion was in the context of advising defendant to tell the truth.[5] Neves denied telling defendant he could do six months, a year or more in CYA on a revocation and that if defendant cooperated Neves would let CYA know. We accept Neves' version of events as the version most favorable to the People and thus conclude no express threats or promises of leniency were made.

Moreover, we reject defendant's contention that the reminder regarding the California Youth Authority parole hold was an implied threat or promise. In determining defendant's confession was the product of a rational intellect and free will, we have taken into account the totality of circumstances surrounding the confession and considered the interviews of September 28 and 29 in their entirety. (See *People* v. *Sanchez* (1969) 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74].) The record of the hearing indicates Officer Neves told defendant it would be important to tell the truth and it would be "in his best interests" to provide truthful answers. ██ "It is settled that admonitions to tell the truth do not amount to coercion"; nor do "assertions that one is better off telling the truth" constitute false promises of leniency. (*People* v. *Andersen* (1980) 101 Cal.App.3d 563, 578-579 [161 Cal.Rptr. 707].) ██ The fact Neves told defendant he knew defendant was on a CYA parole hold was simply a police comment on the realities of defendant's position. (*Id.,* at p. 583.) The record indicates the comment was unaccompanied by threats or promises.

The record also reflects discussion about talking to the district attorney regarding a deal. Neves testified he told defendant he could not offer any deals himself. While defendant testified Neves told him he would talk to the district attorney and if it was found defendant was being truthful he could get a deal of no state time, Neves testified that there was no discussion about what kind of deal defendant sought and specifically denied he promised defendant he would not go to state prison. Neves did talk to the district attorney's office; he testified he told defendant the district attorney would make no deals unless all of the information defendant claimed to have was first on the table. We conclude no implied promise of a "deal" or leniency resulted from these conversations.

---

[5]When asked if he remembered what the CYA discussion was, Officer Neves responded, "I believe that he was on parole and that the parole hold had been placed."

Since we have concluded defendant's waiver of *Miranda* rights and ensuing confession were voluntary, we need not reach defendant's contention a second confession was the result of the same influences which rendered the first confession inadmissible.

 Additionally, defendant contends on appeal Officer Neves' destruction of his interview notes requires the confessions be held involuntary as a matter of law. We disagree.

Neves chose not to record his conversations with defendant. He took notes during the interviews but threw them away, pursuant to his standard procedure, after making his report. Defendant claims these procedures violated the principles of *People v. Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], wherein the court started with the "settled rule that the intentional suppression of material evidence favorable to a defendant who has requested it constitutes a violation of due process, irrespective of the good or bad faith of the prosecution." (*Id.*, at p. 645.) The court concluded that sanctions would be imposed for nonpreservation and nondisclosure *"unless the Government can show that it has promulgated, enforced and attempted in good faith to follow rigorous and systematic procedures designed to preserve all discoverable evidence* gathered in the course of a criminal investigation." (*Id.*, at p. 652.)

Defendant waived his right to raise the *Hitch* contention by failing to argue *Hitch* below or to seek suppression of defendant's statement on that basis. (See *People v. Carrasco* (1981) 118 Cal.App.3d 936, 940 [173 Cal.Rptr. 688].) However, defendant could not prevail on the merits even in the absence of such waiver. Neves had no duty to tape record the interviews. (*People v. Murtishaw* (1981) 29 Cal.3d 733, 755, fn. 17 [175 Cal.Rptr. 738, 631 P.2d 446]; *People v. Goss* (1980) 109 Cal.App.3d 443, 457 [167 Cal.Rptr. 224].) Moreover, "[i]nvestigative notes do not necessarily fall into the category of material evidence bearing directly on an accused's guilt or innocence. Where such notes are incorporated into a formal report, where the officer testifies that the report accurately contains the substance of the information recorded on the notes, and when the report is thereafter turned over to the other side, the requirement of providing all discoverable evidence has been met; due process requires nothing more." (*In re Gary G.* (1981) 115 Cal.App.3d 629, 642 [171 Cal.Rptr. 531]; and see *In re Jessie L.* (1982) 131 Cal.App.3d 202, 211 [182 Cal.Rptr. 396]; *People v. Savage* (1982) 129 Cal.App.3d 1, 3 [180 Cal.Rptr. 761].) While Neves testified at trial that certain details in his notes were not put into the report, he also stated his written report accurately reflected the contents of his notes. There was no contention the notes were destroyed in bad faith, although defendant asserts destruction of the notes resulted in loss of the

opportunity to show "written evidence that California Youth Authority and possibly other threats, inducements and promises had been made to [him] to coax him into making incriminating statements."[6] Moreover, there was no showing of bad faith in the reasons cited by the deputy district attorney for advising Officer Neves there was no reason to record such interviews.

## II

■ Defendant contends the prosecutor had a duty to guard against inadmissible statements from his own witnesses and was guilty of misconduct warranting a mistrial when he violated that duty. When defense counsel raised a question concerning the admissibility of evidence as to the dog's death, the prosecutor indicated he felt it was not relevant and stipulated no photographs regarding that would be introduced. He also stated he would do his best to instruct his witnesses to avoid mention of it in their testimony. Nevertheless, on cross-examination of a prosecution witness, defense counsel asked, "Did you have occasion to look around the landing in front of your apartment?" The witness responded, "Well, I had to clean up the dog. I didn't see nothing there." The trial court denied a motion for mistrial, made later out of the presence of the jury, after the prosecutor assured him he had instructed the witness not to go into the issue of the dog. We find no error.

Defendant's reliance on *People* v. *Glass* (1975) 44 Cal.App.3d 772 [118 Cal.Rptr. 797], is misplaced. In *Glass* the court told the prosecutor to warn the police officer he should not refer to the search warrant for appellant's person; nevertheless the officer testified in response to a prosecution question that he told appellant he had a search warrant for the premises and for his person. (*Id.*, at p. 781.) The court found the reference was serious error in light of the closeness of the case and concluded the conduct of counsel in not specifically and carefully following the court's instructions to advise the witness was inexcusable. In light of its reversal on other grounds, the court found it unnecessary to decide whether the error would justify a reversal in and of itself. (*Id.*, at pp. 781-782.) This case is clearly distinguishable. Here, the prosecutor did advise the witness not to refer to the dog. Moreover, the reference came out not during examination by the prosecutor but during cross-examination by defense counsel.

In *People* v. *Sims* (1976) 64 Cal.App.3d 544, 554-555 [134 Cal.Rptr. 566], the court rejected the contention that defendant's motion for mistrial

---

[6]It should be noted, however, that the Supreme Court in *People* v. *Murtishaw*, *supra*, 29 Cal.3d at pages 752-756, strongly suggests that the intentional destruction of the primary notes of an officer may violate *Hitch* where the statements are not exculpatory and the notes are the only other comtemporaneous record of the interview. The better practice would clearly be to preserve such notes in those circumstances.

should have been granted because the prosecutor engaged in misconduct by asking a question designed to elicit inadmissible testimony. The prosecutor had asked his witness if she knew when defendant got a car and the witness responded, "Sometime before he got out of jail this last time." (*Id.*, at p. 554.) The court indicated the record did not show the prosecutor expected to elicit the testimony, noted the prosecutor had warned the witness prior to trial not to mention defendant had been in or out of jail, and found no evidence of bad faith on the part of the prosecutor. The court also found the trial court properly granted the prosecutor's request for an admonishment that the jury disregard the testimony. The potential for prejudice was much stronger in *Sims* than here. The testimony complained of was ambiguous; there was no mention of the dog's death and the jury could have interpreted the comment as referring only to the dog's having performed some bodily function.

### III

Defendant contends an adult conviction for forgery (Pen. Code, § 470) which resulted in his sentence to the California Youth Authority could not be used to impeach him after he had been physically discharged from that institution, notwithstanding he was on parole from the Youth Authority when he went to trial on the current charges.

He argues the word "discharge" in Penal Code section 17, subdivision (c),[7] is vague and the construction most favorable to him, construing the word "discharge" to mean physical release from the institution, should have been adopted; as so construed, the forgery conviction should have been deemed a misdemeanor which could not under Evidence Code section 788 be used by the prosecutor for his impeachment at trial.

The trial court rejected defendant's contention, concluding that discharge from CYA occurs when the authorities have no more power over a defendant and that parole does not qualify under Penal Code section 17, subdivision (c), as a "discharge" from CYA. Evidence of the conviction was received and during closing argument the prosecutor advised the jury defendant had been convicted of forgery and the conviction could be used to assess defendant's credibility.

We conclude a defendant is not discharged from the Youth Authority within the meaning of Penal Code section 17, subdivision (c), until his

---

[7]Penal Code section 17, subdivision (c), provides: "When a defendant is committed to the Youth Authority for a crime punishable, in the discretion of the court, by imprisonment in the state prison or by fine or imprisonment in the county jail, the offense shall, upon the discharge of the defendant from the Youth Authority, thereafter be deemed a misdemeanor for all purposes."

parole is completed; thus, the trial court did not err in permitting the prosecutor to use the forgery conviction to impeach defendant. In making this determination, we look to the provisions of the Welfare and Institutions Code referring to "discharge" and "release" which appear in article 4, entitled "Powers and Duties of Youth Authority."[8] (See 58 Cal.Jur.3d, Statutes, § 127, p. 521.)

In general, those provisions use "discharge" to refer to the end of control by authorities, distinguishing such term from "release" from confinement. Thus, section 1723 discusses "every order granting and revoking parole and issuing final discharges to any person under the jurisdiction of the Youth Authority." Section 1759 governs "release" of persons by an institution or agency. Subdivisions (d) and (e) of section 1760 distinguish between persons who have been released from confinement by the Youthful Offender Parole Board upon conditions, and persons who have been discharged by the Youthful Offender Parole Board from its control. Section 1765 provides the Youthful Offender Parole Board shall retain a person under supervision and control so long as such control is necessary for the protection of the public and "shall discharge such person as soon as in its opinion there is reasonable probability that he or she can be given full liberty without danger to the public." Similarly, section 1766 permits the Youthful Offender Parole Board to order renewed "release" under supervision and to "discharge" a person from its control when such discharge is consistent with the protection of the public. Sections 1769 through 1770.1 refer to discharge upon expiration of a period of control. Finally, section 1772 defines "honorably discharged" to include every person whose discharge is based on a good record on parole.[9]

It is clear that a defendant on parole from the Youth Authority is subject to the control of the authority. As the Supreme Court said in *People v. Olivas* (1976) 17 Cal.3d 236, 245 [131 Cal.Rptr. 55, 551 P.2d 375]: "Wards of the Youth Authority released on parole although not incarcerated in an institution still remain subject to a number of significant restraints on their freedom. In addition to any special conditions which may be imposed, Youth Authority conditions of parole typically embrace the duty to follow all instructions of a parole agent including mandatory involvement in a se-

---

[8] Unless otherwise indicated, all statutory references hereafter are to the Welfare and Institutions Code.

[9] The only section we have found in which "discharge" is used to describe release from institutional custody is section 1758, providing discharge of a person by an institution or agency *not* operated by the authority shall not terminate the control of the authority over such person. The statute by its terms does not aid in interpreting "the discharge of the defendant from the Youth Authority" under Penal Code section 17, subdivision (c). Moreover, we believe that section must be read in conjunction with section 1759, requiring approval of the "release."

lected employment, education or training program, submission to medical or psychiatric examinations or treatment as directed by the Youth Authority and the necessity of obtaining permission in order to change residences. (Youth Authority Bd. Policy Manual, Appen. F., Conditions of Parole.) Moreover, the parolee must acknowledge that he is still under the control of the authority and that violations of parole conditions may result in temporary detention for up to 30 days or return to an authority institution for the remainder of the commitment period. (*Id.*, §§ 1177, 1767.3.)" As indicated by these code sections, a "discharge" occurs only at the end of that period of control, that is, when parole has been completed.

IV

■ Defendant contends the secret recording of his conversation with another suspect while in the back of a patrol car violated Penal Code section 2600; in support thereof he cites *De Lancie* v. *Superior Court* (1982) 31 Cal.3d 865 [183 Cal.Rptr. 866, 647 P.2d 142]. In *De Lancie,* plaintiffs challenged the policies of monitoring and recording conversations between detainees in the county jail and their visitors, and among detainees in every room of the jail. (*Id.*, at pp. 868-869.) The court concluded that insofar as the complaint alleged the jail officials' monitoring practice had been undertaken for the purpose of gathering evidence for use in criminal proceedings rather than to maintain the security of the jail the complaint stated a cause of action for declaratory and injunctive relief under sections 2600 and 2601 of the Penal Code. (*Id.*, at p. 877.) Defendant focuses on Officer Ortiz' testimony (agreeing that his purpose in shutting the doors and leaving the vehicle after activating the tape was a hope that by being left alone in the rear of the car the suspects would make statements giving information that would later be useful in evidence) to support his contention that the recording violated Penal Code section 2600.

Defendant's reliance on *De Lancie* is misplaced. That case dealt with monitoring of conversations in a county jail and there is no suggestion therein that the court would reach a similar result as to patrol car conversations. Penal Code section 2600 refers to confinement in a state prison. While the court in *De Lancie* concluded the limitations imposed by Penal Code sections 2600 and 2601 were equally binding on county jail authorities (*De Lancie* v. *Superior Court, supra,* 31 Cal.3d at p. 872), we do not believe Penal Code section 2600 can be construed to apply to a temporary detention of suspects in the back of a patrol car immediately after their arrest.

. Defendant asserts, however, that he was "jailed" or was a jail detainee when he was handcuffed and placed in the back of the caged patrol car. He cites *People* v. *Best* (1959) 172 Cal.App.2d 692, 695 [342 P.2d 314], and

*People* v. *Carter* (1981) 117 Cal.App.3d 546, 549-550 [172 Cal.Rptr. 838], which define a jail as a place of confinement of persons held in lawful custody. These cases are inopposite; *Best* involved someone kept in the main office of the building housing the city police headquarters and jail until he was able to post bail, while *Carter* considered blocks of cells in a sheriff's station. Websters' Third New International Dictionary (1971) at page 1208, defines "jail" to include "a building for the confinement of persons held in lawful custody." Black's Law Dictionary (rev. 4th ed. 1968) at page 968, defines "jail" to include "a building designated by law, or regularly used, for the confinement of persons held in lawful custody." A "jail" includes "a place in which persons accused of crime, who are not able to furnish bail, or are not entitled to furnish bail, pending action by the grand jury, or the filing of an information, are confined, prior to being brought on for trial," according to Ballentine's Law Dictionary (3d ed. 1969) at page 672. These definitions support our conclusion defendant was not "jailed" when he was placed in the back of the patrol car and, therefore, Penal Code section 2600 is not applicable here.

Since we find Penal Code section 2600 inapplicable, we must address defendant's contention the surreptitious recording of his patrol car conversation violated his right to privacy guaranteed by article I, section 1, of the California Constitution. Defendant submits his constitutional right to privacy represents a fundamental interest which cannot be breached unless the government demonstrates a compelling interest. (*White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222].) He asserts the police have demonstrated no compelling reason for the recording and the recording and evidence obtained as a result must, therefore, be suppressed. We disagree. *White* did not involve the issue of the relationship between the search and seizure provisions and the right of privacy provisions (Cal. Const., art. I, §§ 13 and 1, respectively). Indeed, the court in *White* noted, in holding the allegations of the complaint presented a prima facie violation of the state constitutional right of privacy, that given the complaint's allegation that the information gathered by undercover agents pertained to no illegal activity or acts, "a strong suspicion is raised that the gathered material, preserved in 'police dossiers,' may be largely unnecessary for any legitimate, let alone 'compelling,' governmental interest." (*Id.*, at p. 776.)

"The California Supreme Court has consistently declared that in determining whether an illegal search has occurred under article I, section 13, of our Constitution, the appropriate test is whether a person has exhibited a reasonable expectation of privacy, and *if so*, whether that expectation has been violated by unreasonable governmental invasion. [Citations]. In contrast, when generally discussing the right of privacy declared in article I, section 1, the court has also said that intrusion into that right must be

justified by a 'compelling interest.' [Citations.] The interface between these two analytical frameworks has yet to be definitively explained by the Supreme Court." (Fn. omitted.) (*People* v. *Williams* (1982) 128 Cal.App.3d 981, 986 [180 Cal.Rptr. 734].)[10]

In this case, we find it unnecessary to attempt to define the relationship between these provisions because we conclude under either provision a defendant may not complain of governmental intrusion unless he has first established an objectively reasonable expectation of privacy.[11] (See *In re Deborah C.* (1981) 30 Cal.3d 125, 135 [177 Cal.Rptr. 852, 635 P.2d 446]; *People* v. *Williams, supra,* 128 Cal.App.3d at p. 987.) We find defendant had no objectively reasonable expectation of privacy while confined in the back of the patrol car. (*Williams,* at p. 987; *People* v. *Jardine* (1981) 116 Cal.App.3d 907, 914 [172 Cal.Rptr. 408]; *People* v. *Newton* (1974) 42 Cal.App.3d 292, 296 [116 Cal.Rptr. 690]; *People* v. *Todd* (1972) 26 Cal.App.3d 15, 17 [102 Cal.Rptr. 539].)[12]

---

[10]In a case involving a secretly recorded conversation between two suspects locked in a police station interview room, the First District stated in *People* v. *Owens* (1980) 112 Cal.App.3d 441, 448 [169 Cal.Rptr. 359]: "We are convinced, however, that in a pretrial detention facility, where the very fact of incarceration greatly diminishes both the expectation of and the right of personal privacy, and where the state interest in protecting the security of the facility as well as the public at large is of paramount importance, the distinction between what is 'reasonable' under the Fourth Amendment and what is 'compelling' under article I, section 1, is nonexistent." However, in a concurring opinion, White, P. J., indicated he did not then understand the decisional law to assume " 'search and seizure and privacy protections to be coextensive when applied to police surveillance in the criminal context.' " One author, in suggesting a Fourth Amendment approach may be an appropriate model for many privacy situations, has also articulated certain obstacles to such approach. (See Kornhauser, *Privacy: The New Constitutional Language and the Old Right* (1976) 64 Cal.L.Rev. 347, 364; see also *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]; Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349.)

[11]While we do not reach the question of whether the governmental interests in this case are compelling, we note that in recording a patrol car conversation between two arrestees the government may have an interest in assuring that the arrestees do not take the opportunity to "get their stories straight" or plan an escape. The police can reasonably expect that such conversations will touch on criminal activity and have an interest in ferreting out and solving crimes. (See *People* v. *Owens, supra,* 112 Cal.App.3d at pp. 449-450.)

[12]*North* v. *Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305, 57 A.L.R.3d 155] is distinguishable. There, circumstances which lulled the petitioner and his wife into thinking their "jailhouse" conversation (challenged as being the product of an unreasonable search and seizure) would be confidential, coupled with the statutory presumption that a conversation between spouses is presumed to have been made in confidence, constituted a sufficient showing by petitioner to establish a reasonable expectation of privacy. (*Id.,* at pp. 311-312.) The court there was careful to note that an ordinary jailhouse conversation between spouses could not be deemed to have been made in confidence, as required to establish the privilege. (*Id.,* at p. 311.) A distinction is readily apparent between the situation in *North* where the detective surrendered his private office so that the spouses might converse and the defendant's placement in the patrol car for transportation. Additionally, in the instant case we are not dealing with a privileged communication between spouses.

After the filing of our opinion the Supreme Court rendered its decision in *People* v. *Crowson, supra,* 33 Cal.3d 623. There defendant contended that the admission of a secret tape recording of his police car conversation with his confederate violated his constitutional right of privacy under article I, section 1 of the California Constitution. A divided court affirmed his conviction. Justice Kaus, in an opinion joined by Justices Mosk and Richardson, concluded that an arrested suspect has no reasonable expectation of privacy in the back seat of a police car. Those justices distinguished *De Lancie* on the ground that it "held that [Penal Code] sections 2600 and 2601 accord prison inmates—and, by necessary implication, jail detainees—a statutory right to privacy in prisons and jails that may not be abridged except 'to provide for the reasonable security of the institution . . . and for the reasonable protection of the public.' (§ 2600.) *De Lancie,* however, did not involve the rights of arrestees—like Crowson—who are not confined in jail, and did not purport to assess an arrestee's reasonable expectations of privacy outside of the jail setting—for example, in the back seat of a police car. In our view, sections 2600 and 2601 simply have no application to this situation." (*Id.,* at p. 630.)

Justice Broussard, relying upon the rationale of *De Lancie,* disagreed with this analysis. Noting, however, that *De Lancie* was decided several months after defendant's trial and implicitly rejecting the argument that *De Lancie* ought to be applied retroactively, he concluded that the challenged recording was properly admitted under *North* v. *Superior Court, supra,* 8 Cal.3d 301, and other pre-*De Lancie* cases because the conversation did not fall within a privilege protected by the Evidence Code.

Chief Justice Bird, in a dissent joined by Justice Reynoso, concluded that the clandestine tape recording violated defendant's right of privacy under the state Constitution.

Since a majority of the Supreme Court has not yet decided either the privacy issue or the question of retroactivity of *De Lancie,* we are free to resolve the issue. We remain convinced that our analysis, and that of Justice Kaus, are the correct ones.

The judgment is affirmed.

Puglia, P. J., and Sparks, J., concurred.