Filed 10/15/13  P. v. Sanchez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ISRAEL JAMMIR SANCHEZ,<br><br>        Defendant and Appellant. | B239022<br><br>(Los Angeles County<br>Super. Ct. No. BA372623) |

        APPEAL from a judgment of the Superior Court of Los Angeles County. Craig Richman, Judge.  Affirmed and remanded.

        Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Tasha G. Timbadia, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an information filed by the Los Angeles County District Attorney's Office, appellant Israel Jammir Sanchez was charged with attempted willful, deliberate, and premeditated murder. (Pen. Code, §§ 664/187, subd. (a).)[1] It was further alleged that appellant personally and intentionally used a firearm (a handgun) in the commission of the aforementioned crime (§ 12022.53, subd. (d)) and that the offense was committed at the direction of, in association with, or for the benefit of a criminal street gang (§ 186.22, subd. (b)). Appellant pled not guilty and denied the special allegations.

Trial was by jury. Appellant was found guilty of attempted murder. The intentional discharge of a firearm causing great bodily injury and gang allegations were also found true. The premeditation allegation was found not true.

Probation was denied, and appellant was sentenced to a term of seven years plus 25 years to life, consisting of the middle term of seven years for attempted murder and an additional 25 years to life for the use of a firearm resulting in great bodily injury. The gang enhancement was stayed.

Appellant timely appealed.[2] On appeal, he argues: (1) The trial court committed reversible error by admitting into evidence appellant's confession; the confession was improperly obtained by police coercion. (2) The trial court's instructions on accomplice witness evidence needed amplification; defense counsel's performance was deficient in failing to seek complete and necessary accomplice instructions. (3) Appellant was deprived of effective assistance of counsel at sentencing; therefore, the case must be remanded to the trial court to either strike or impose the gang enhancement.

We agree that the trial court erred by failing to either strike or impose the gang enhancement; the matter is remanded for the limited purpose of allowing the trial court to

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    On December 3, 2012, appellant filed a petition for writ of habeas corpus, case No. B245387. On December 17, 2012, this court ordered that the petition be considered concurrently with this appeal. A separate order will be filed in that matter.

2

impose or strike the additional term specified in section 186.22, subdivision (b).  In all other respects, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGOUND

I. *Prosecution Evidence*

On October 21, 2008, appellant and the victim, William Thomas (Thomas), were detained in Juvenile Hall.  Thomas was a member of the "Drifters" criminal street gang; appellant belonged to rival street gang, "Barrio Gods" or "Gods of Destruction."  The Barrio Gods gang's primary activities include obtaining firearms, possession and sale of narcotics, and committing vandalism, robberies, and murder.

At approximately 11:55 a.m., appellant and Thomas were being escorted back to school from their dormitory when appellant approached Thomas and attacked him, striking him three times with a closed fist.  Thomas suffered a dislocated nose.  After the incident, Thomas told an officer that he and appellant had a "'personal beef.'"

On June 16, 2010, 16-year-old Jessica[3] Lucero (Lucero) was appellant's girlfriend and pregnant with his child.  Lucero lived with her mother on 6th Avenue.  At approximately 2:48 p.m., appellant and his friend Margarita Lopez (Lopez) went to Lucero's house.  Appellant and Lucero got into an argument and she left to walk to the library.  As Lucero was walking, she saw Thomas.  Lucero knew that appellant and Thomas were enemies because of their rival gang affiliations.

Lucero called appellant and told him about Thomas.[4]  Appellant replied, "'Ooh. Say no more.'"  He was "laughing."  He went into the other room, got Lopez, and told her that they were going to pick up Lucero and get something to eat; they left in Lucero's mother's black Volvo, with Lopez driving and appellant riding as a passenger.  Lopez

---

[3]     In the appellate record, her name is sometimes spelled "Yessica."

[4]     During the police interview with Lucero, Lucero told the interviewing officer that at some point appellant told her that he was "'gonna do one last thing for the hood'" and then stop "'gangbang[ing].'"

3

and appellant picked up Lucero, who got into the car. When they stopped and picked up Lucero, appellant told Lopez that his "enemy was walking on the street.'"

They drove until appellant told Lopez to stop. He told Lopez that he was going to Winchell's and asked her if she wanted a donut. Appellant then exited the vehicle and ran in the opposite direction of the Winchell's.

Lopez continued driving and Lucero pointed out where Thomas was walking. Appellant then said, "'Ooh. Say no more.'" Lopez stopped the vehicle and appellant got out and snuck up behind Thomas. Appellant then took out a handgun and fired three shots at him. One bullet hit Thomas in the back; the other two bullets struck residences nearby. Appellant ran back to the vehicle, got in, and told Lopez to drive away. Then, he told Lopez and Lucero that he had shot someone.

Appellant was arrested later that night. During his interview at the police station, he admitted to shooting Thomas and declaring "'Barrio Gods'" before he pulled the trigger. Appellant said that he "'had to do what [he] had to do.'" Appellant knew that Thomas had been hit by a bullet and he thought that Thomas was "[g]onna die."

II. *Defense Evidence*

Appellant did not present any evidence on his behalf.

## DISCUSSION

I. *Admission of Appellant's Confession*

Appellant contends that his conviction must be reversed because the admission of his confession into evidence was erroneous. Specifically, he argues that the confession was involuntary because it was "the result of psychological pressure and coercion," including promises of leniency and the threat to prosecute Lucero.

4

A.  Interview and confession

On June 16, 2010, at approximately 1:21 a.m., Detective Timothy Stack and Detective Talbot interviewed appellant after his arrest.  Appellant indicated that he was "tired" and Detective Talbot removed appellant's handcuffs to make him more "comfortable."  Appellant was allowed to stretch and was offered water.  He was read his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), and he indicated that he understood them.

Appellant then proceeded to talk about an altercation that had occurred earlier in the day at a Winchell's donut shop.  After that incident, appellant indicated that he had "chill[ed]," "hopped [into a] van," and went to "this side of town."  According to appellant, "[t]hat's when everything happened."

Detective Stack then told appellant, "it's not looking good bro."  He advised appellant that it was his "job" to find out the truth.  Detective Stack stated:  "'[Y]ou know that I already know that something happened.  And, you know, I can—I'm not gonna sit here and try to prove to you that I know what happened.  But [I will] tell you right now, it's pretty overwhelming.  You know what I'm saying?  At 18 years old there's a difference between going to jail for life, okay?—or getting paroled after X amount of years, okay?  You know people who've gone to jail for shootings.  You know people who've gone to jail for, you know, for other things, stabbings, or whatever—whatever they went to jail for, okay?  And they either took a deal or they said, 'You know what, okay this is what happened' and they tell the truth and they don't go to jail for the rest of their lives, okay?  You're only 18 years old.  You don't need to be in jail the rest of your life.  I will tell you right now.  All bullshit aside, I know what you did, okay?  [F]or many different reasons I know what you did.  And whether you believe me or not, again, we wouldn't have been chasing you down Broadway.  I wouldn't have a certain vehicle already impounded for evidence.  I wouldn't have two girls going to jail tonight.  I wouldn't have all these things unless I had a lot of information."

Detective Stack then told appellant that he wanted to hear "in [his] words" what happened, why he "had a beef with this guy" and "thought [he] needed to do what [he]

needed to do." Detective Stack also advised appellant that he had talked to a "homicide detective with the suit," and asked what he thought appellant was "gonna get [sentenced to]." Detective Stack was told that with the gang allegation, appellant was "'guaranteed, 25 to life.'" Detective Stack said that he had also asked the detective if it would make a difference if appellant cooperated; he told appellant that he was told that the district attorney would consider appellant's cooperation. He added: "[T]hey're not going to give you 25 to life or it's definitely not going to be, you know, 'hey, we're not—there's no deals on the table. We're done.' [O]kay?"

Detective Stack again asked about the "beef" between appellant and Thomas. The following exchange occurred:

"[APPELLANT]: Well, what's going to happen to my baby's mama?

"[DETECTIVE STACK]: Well, it depends on what you tell me. Because I'll tell you what, when you go to court if you want to nut-up and say nothing happened—

"[APPELLANT]: Yeah. I know.

"[DETECTIVE STACK]: [T]hen your . . . baby's mama is going to go down for just exactly the same thing you go down for.

"[APPELLANT]: Yeah. I know.

"[DETECTIVE STACK]: Okay. So what was the beef? Why'd you do what you do?

"[APPELLANT]: Because he's a rival gang member.

"[DETECTIVE STACK]: He is? What a—have you seen him before?

"[APPELLANT]: Yeah.

"[DETECTIVE STACK]: How many times?

"[APPELLANT]: Plenty.

"[DETECTIVE STACK]: Have you gotten in fights before?

"[APPELLANT]: Yeah.

"[DETECTIVE STACK]: Yeah? Has he ever pulled a gun on you or anything?

"[APPELLANT]: Like I said—that don't matter, but I had to do what I had to do sir.

"[DETECTIVE STACK]:  Yeah?  How many times you shoot at him?

"[APPELLANT]:  Three times.

"[DETECTIVE STACK]:  Three times, that's it?  How many times you think you hit him?

"[APPELLANT]:  I don't know sir."

Appellant proceeded to provide additional details about the shooting, including how he arrived at the scene and that Lopez and Lucero were in the car with him. Appellant stated that he was "just angry" and thought that Thomas was going to die when he shot him.  Appellant knew that he had hit Thomas because Thomas "screamed."

Detective Stack then asked appellant what he had done with the weapon he used; appellant told the detective that he threw it into the ocean.  Detective Stack told appellant that he was lying and offered to show him the weapon.  Appellant replied, "You know I'm going to get 25 to life sir."  Detective Stack responded:  "Dude, I told you already bro.  I told you already.  You know what I'm saying?  I wouldn't sit you across from me and try to get you to—all I need honestly from you right now is for you to tell me [that you] did it.  I can walk out the door.  You've just gave me a confession I walked out the door.  I'm done.  You see what I'm saying?  There's a difference between you telling me what you're telling me and being cooperative with me than you just saying, 'I did it.  I'm not gonna say anything else.'  There's a big difference.  Okay?"

Appellant then inquired, "If I cooperate with you, everything is going to go good for . . . ."  Detective Stack interjected:  "Well, I could tell you what.  If you cooperate with me everything is going to be—I would say—I'm not going to say it's gonna be any easier on you.  I'm not gonna say I'm gonna promise anything special.  But I'm gonna say, 'Who's going to go file this case?  Who's gonna walk this case to the DA tomorrow?[']  I am and my partner over there is.  Okay?  And this is my boss.  So we're the ones that are gonna talk to the DA's office.  We're the ones that are gonna say, 'Hey, this is what we want.'  And they're either gonna listen to us or not gonna listen to us. Okay?  [¶]

7

"On the other side of that, I also have a lot of say when I go [to] the DA's office and I say, 'Hey, I don't think these girls are as involved as we thought they were,' or 'Hey, I think we should slam dunk—girls.' Okay? And as far as I'm concerned, you're being a man. Okay? You made a mistake. You did something you . . . probably shouldn't have done. And you know that right now. Okay? And you got caught doing it. Okay?"

Detective Stack then encouraged appellant to tell the truth about what had happened to the weapon he had used and for additional details about his motive for the shooting. Appellant recalled that he had "sneaked up" on Thomas, yelled out "'Barrio Gods,'" and then shot him. Appellant wanted Thomas to know "what[ was] up."

Detectives Stack and Talbot then talked to appellant about the importance of taking responsibility for his life and making a change for his baby on the way. When asked if appellant had any questions, he responded: "Yeah. My baby mama. So what you think could happen to her?" Detective Stack said that he would have to talk to his partner about it. Appellant then offered to tell them the "whole story" again to make sure that they got "everything straight." He stated, "I just don't want to let—let her do time for stupid shit that I did. I don't even care about no time. Just not—not her. She didn't do shit. Not my baby neither."

Detectives Stack and Talbot asked appellant additional questions about his gang's territory. He interrupted their conversation, stating, "Dang but—so my girl, like dang. She ain't have nothing to do—like I don't care if I do time, but I just don't want her to do time." Detective Stack indicated that he understood, reiterating, "[W]hat's important here though is, like you said—I know you're worried about baby mama and stuff—it's—it's important you stay with the truth." Appellant concurred, saying, "You guys are gonna be honest with me and tell me that you gonna go—I come at you straight up and you gonna come back at me straight up." The detectives agreed and appellant discussed the events that led up to the shooting. After providing these additional details, appellant asked: "By telling you all the truth, that means like, that probably—the [district attorney]

will probably cut me a little bit of slack?" Detective Talbot responded, "That's up to the [district attorney]."

Detective Slack confirmed, saying: "Yeah. That's completely up to the [district attorney]. Like I said man, don't want to—I don't want to let you—I don't want to say, 'Oh. [Y]eah dude. You tell the truth [¶] . . . [¶] [Y]ou're just gonna'—You know? I don't wanna say that. You know? What if they do throw the book at you? You know what I mean? [¶] . . . You'd think I'm a straight asshole for telling you that . . . . But, I'm telling you right now. You know, there is always that, [']well how was he?' 'Well he was cooperative?' 'What'd he tell—'Yeah he told us everything' You know? Okay. 18 years old. You know? [V]ery limited criminal background. All this—all these things they take into—you know—consideration."

Appellant responded that he understood. After giving additional details about the shooting, appellant again asked whether the detectives were able to get him a "deal with the [district attorney], just at least try to get the two girls out of this." Detective Stack replied that he would "do what [he could]." Appellant then inquired whether he should obtain an attorney to "cut down some years." The detectives responded that they could not give him any legal advice.

Appellant was offered more water, and he asked what time it was. Detective Stack told him that it was "a little after three." Appellant responded, "Dang. Time went by that quick?" Detective Stack replied: "Yeah. It's crazy. Time goes fast when you're thinking about everything else in the world, huh?"

B. <u>Motion to exclude appellant's confession</u>

Defense counsel moved to exclude evidence of appellant's confession. The People opposed the motion.

At the hearing on appellant's motion, Detective Stack testified that when he told appellant that another detective had said that he would probably get "25 to life" and that there were "no deals on the table," he was trying to get appellant to "be truthful." When asked whether Detective Stack used appellant's girlfriend (Lucero) as "pressure" to get appellant to confess, the trial court interjected and, citing *People v. Barker* (1986) 182

9

Cal.App.3d 921, ruled that it was going to "sustain its own objection to the form of the question. It was [appellant] who brought up [his girlfriend]."

Detective Stack reiterated that his comments to appellant were an attempt to get more of a very detailed description of the facts of the case and he was concerned about determining "how involved [Lucero and Lopez] were in the case." Finally, Detective Stack stated that he did not advise appellant that his influence could be used with the district attorney to "fil[e] [the] case in a certain way."

The prosecutor argued that despite appellant's age, he was a "sophisticated" gang member, having joined the gang when he was 12 years old. In addition, he had had multiple contacts with the police and knew about concepts like "25 to life" and "how it works." The prosecutor pointed out that Lopez and Lucero, who were in the car with appellant when the shooting occurred, had already indicated that appellant was the shooter. Thus, the only determination left was whether Lucero and Lopez were also involved as accomplices. Next, the prosecutor argued that appellant had initiated the inquiry into what would happen to his girlfriend and, accordingly, it did not play a role in getting him to confess. Then, the prosecutor noted that the interview was conducted while the officers were in "plain clothes" and that there was a "very calm, serene conversational tone" during the interview. Finally, the prosecutor argued that appellant was not made any promises and that, under the totality of the circumstances, the interview was not coercive.

Defense counsel argued that appellant was coerced into making inculpatory statements when an implied promise was made about his "baby mama." Further, defense counsel stated that Detective Stack implied that if appellant cooperated and told them how "he did it," then he would be given a deal.

After entertaining oral argument, the trial court stated that it had watched the videotape of the interview and found: "[T]he cold transcript does not reflect correctly the tone or color of this interview. And to Detective Stack's credit, I find absolutely nothing in this interview that would even remotely approach improper police conduct that would be coercive; that would have caused, as a motivating factor, [appellant] to give a

10

statement. [¶] . . . [B]oth Detective Stack and Detective Talbot were wearing plain clothes. Detective Talbot's badge was hanging from his chest and prominently displayed, but each [was] almost nocturnal in their conversations with [appellant] discussing if he gets out of prison that he needs to take responsibility and become a good family man, which—and that portion of the conversation was long after the statements were made.

"The statement begins with basically a total denial of involvement. Detective Stack leans back in his chair and says, 'Hey, look. Basically'—And I'm paraphrasing—'I know that you are lying to me. I can just write the report right now and end it. But if you cooperate, everyone will know.' And there's nothing wrong with pointing out benefits that flow naturally from cooperation. . . .

"And—and that point that Detective Stack was trying to make at that point was, 'Look. We—we know what happened here. It's—it's up to you at this point in time.' And from that moment on, [appellant's] obvious thought process was to minimize the involvement of Ms. Lucero and Ms. Lopez.

"The discussion regarding 25 to life, the *Williams*[5] case I cited to counsel originally at 49 Cal.4th 405, it talks about the death penalty. We are way below that. Again, no promises were made by the detectives. They merely said that his cooperation may be considered by the court and the jury—and, again, the cases cited in *Williams* reflect that there is nothing wrong with that.

"I do believe that the statement was voluntary. I already ruled that [out] there was no violation of *Miranda*. The statement is admissible."

C. Relevant law

"The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession. [Citation.]" (*People v. Massie* (1998) 19 Cal.4th 550, 576.) A confession is involuntary if it is "obtained by force, fear, promise of immunity or reward . . . ." (*People v. Esqueda* (1993) 17 Cal.App.4th 1450, 1483 (*Esqueda*).) Thus, in order to use

---

**5**  *People v. Williams* (2010) 49 Cal.4th 405.

11

a confession, the prosecution has the burden of proving by a preponderance of the evidence that the defendant gave it voluntarily, and not as the result of any form of compulsion or promise of reward. (*People v. Williams* (1997) 16 Cal.4th 635, 659–661.)

Conversely, "[a] confession or admission is involuntary, and thus subject to exclusion at trial, only if it is the product of coercive police activity. [Citations.]" (*People v. Williams*, *supra*, 16 Cal.4th at p. 659.) Coercive activity must be "the 'proximate cause' of the statement in question . . . . [Citation.]" (*People v. Mickey* (1991) 54 Cal.3d 612, 647.)

In determining whether a confession was voluntary, "courts apply a 'totality of circumstances' test . . . ." (*People v. Massie*, *supra*, 19 Cal.4th at p. 576.) Among the factors to be considered are "'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; [and] its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.'" (*People v. Williams*, *supra*, 16 Cal.4th at p. 660.) Other characteristics of the defendant to be considered are his age, sophistication, prior experience with the criminal justice system, and emotional state. (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 209.)

Moreover, "'"[t]he question is whether defendant's choice to confess was not 'essentially free' because his will was overborne." [Citation.]' [Citation.]" (*People v. Boyette* (2002) 29 Cal.4th 381, 411.)

A reviewing court upholds the trial court's findings as to the circumstances surrounding the confession if they are supported by substantial evidence, but exercises independent review in determining whether the confession was voluntary, given the totality of the circumstances, including those that are undisputed and those properly found by the trial court. (*Esqueda*, *supra*, 17 Cal.App.4th at p. 1465; see also *People v. Williams*, *supra*, 16 Cal.4th at pp. 659–661; see also *Arizona v. Fulminante* (1991) 499 U.S. 279, 285–286.) Thus, in the present case, we must analyze whether the influences brought to bear on appellant were such as to overbear his will to resist, thus bringing about a statement that he did not freely choose to make. (See *People v. Hogan* (1982) 31

12

Cal.3d 815, 841, disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.)  In making this determination, we evaluate whether the police conducting the interview acted in an oppressive or coercive manner.  (See *Colorado v. Connelly* (1986) 479 U.S. 157, 163–164.)

Also, here, the interview was tape-recorded so the facts surrounding the giving of the statement are undisputed.  (*People v. Maury* (2003) 30 Cal.4th 342, 404.)

D.  Appellant's confession was properly admitted

Applying the foregoing legal principles, we conclude that the trial court did not err when it admitted appellant's confession into evidence.

1. *Particular circumstances of the interview*

Appellant contends that his particular circumstances (18 years old, limited prior contact with the criminal justice system, the fact that he had been smoking marijuana before his arrest, and the fact that he was tired and thirsty) resulted in him being in "relatively poor physical and mental condition" when he gave his confession.  To the contrary, appellant was no neophyte with regard to the criminal justice system.  He had been a gang member since he was 12 years old.  He had numerous juvenile petitions starting in 2007, when he was only 15 years old, for drug offenses, possession of a loaded firearm, and vandalism.  In addition, during his interview, he acknowledged his familiarity with several officers in the gang unit that patrolled his gang's "territory" and his understanding of terms like "25 to life" and "how the system works."

Moreover, appellant's handcuffs were removed at the start of the interview and he was offered water.  Towards the end of the interview, he was again offered water.  And, at that time, when appellant asked and was told what time it was, he commented on how quickly the time had passed by.

Furthermore, the interview was conducted in a relaxed and informal environment.  Both officers were in plain clothes and spent a good portion of the interview time counseling appellant on the benefits of changing his "gang banging" lifestyle.

In addition, although the interview lasted about an hour and a half, appellant's confession came much earlier in the interview.

13

Finally, the trial court, having watched and listened to the videotape of the interview and heard Detective Stack's live testimony, was in the best situation to make a determination that appellant's confession was voluntary. This determination is well-supported by the evidence. (*People v. McWhorter* (2009) 47 Cal.4th 318, 358.)

### 2. *Promises of leniency or threats*

Appellant contends that his confession was involuntary because it was coerced and induced by threats and promises of leniency for himself and Lucero, his pregnant girlfriend. He further argues that the trial court improperly found that *People v. Barker*, *supra*, 182 Cal.App.3d at page 933, made Detective Stack's alleged threats to prosecute Lucero irrelevant.

"In general, '"any promise made by an officer or person in authority, express or implied, of leniency or advantage to the accused, if it is a motivating cause of the confession, is sufficient to invalidate the confession and to make it involuntary and inadmissible as a matter of law."' [Citations.] In identifying the circumstances under which this rule applies, we have made clear that investigating officers are not precluded from discussing any 'advantage' or other consequence that will 'naturally accrue' in the event the accused speaks truthfully about the crime. [Citation.] The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." (*People v. Ray* (1996) 13 Cal.4th 313, 339–340; see also *People v. Seaton* (1983) 146 Cal.App.3d 67, 74 (*Seaton*).)

Exhortations to tell the truth are not impermissible. (*People v. Holloway* (2004) 33 Cal.4th 96, 115.) Nor is it improper for the police to emphasize the realities of a defendant's plight. (See *Seaton*, *supra*, 146 Cal.App.3d at p. 74 [mention of parole hold simply a comment "on the realities of defendant's position"]; *People v. Flores* (1983) 144 Cal.App.3d 459, 469 ["truthful and 'commonplace' statements of possible legal consequences, if unaccompanied by threat or promise, are permissible police practices"].) In this case, the various exhortations to appellant to confess were not inherently coercive, and there were no bargains. (See *Seaton*, *supra*, 146 Cal.App.3d at p. 74 [no implied

14

promise of lenity where officer "told defendant the district attorney would make no deals unless all of the information defendant claimed to have was first on the table"]; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1203–1204; *People v. Spears* (1991) 228 Cal.App.3d 1, 27–28.)

Detective Stack's comments did not constitute improper promises of leniency. Instead, the advisements were exhortations to tell the truth. Detective Stack repeatedly told appellant that it was the district attorney's decision as to what he would be charged with. Even in response to appellant's query ("By telling you all the truth . . . the [district attorney] will probably cut me a little bit of slack?"), both Detective Stack and Detective Talbot told him that it was "up to the [district attorney]." Their statements made it clear that the only effect the detectives could make on the charges filed was to bring appellant's statements to the district attorney, who could consider appellant's honesty in coming forward. (*People v. Groody* (1983) 140 Cal.App.3d 355, 359.) In other words, the interview with appellant was a "'dialogue or debate between suspect and police in which the police commented on the realities of [his] position and the courses of conduct open to [him].'" (*People v. Holloway, supra,* 33 Cal.4th at p. 116.)

Detective Stack did not improperly promise appellant any benefit or other lenient treatment; he merely highlighted the benefits that could ensue from a truthful statement. As set forth above, appellant was cognizant of his rights when he decided to talk to the detectives. Before appellant confessed, Detective Stack informed him that he could deny any knowledge of why he had been arrested in the face of already overwhelming evidence or tell them in his own words what had happened. It was at that point that appellant chose to continue to talk to the detectives and admitted that he had "snuck up" on Thomas and shot him because of their rival gang affiliation.

Just as Detective Stack's comments were not promises, they were also not threats. At the onset of the interview, Detective Stack informed appellant that he "had a lot of information." He told appellant that he already knew what he had done and that the situation was "pretty overwhelming." He explained that he would not have chased appellant down, have impounded the Volvo, and had "two girls going to jail tonight" if

15

he did not have a lot of information. In context, Detective Stack was only enumerating the evidence the police already had against appellant. (*People v. Andersen* (1980) 101 Cal.App.3d 563, 579 [urgings by the police to tell the truth do not amount to threats or promises of leniency].)

*People v. Barker*, *supra*, 182 Cal.App.3d 921 does not compel reversal. In that case, the interviewing detective told the defendant that he would not charge his girlfriend if he told the truth. (*Id*. at p. 929.) Even in those circumstances, the Court of Appeal found that the defendant's subsequent confession was "not necessarily" inadmissible. (*Id*. at p. 933.) In contrast, here no promises not to charge Lucero were made.

We are likewise not convinced by appellant's claim that Detective Stack "exploit[ed] appellant's concern for his girlfriend and their unborn child." Again, Detective Stack only maintained that appellant "stay with the truth." It was appellant who repeatedly inquired as to the outcome for his girlfriend and offered, without prompting, to reiterate the details of the shooting to demonstrate Lucero's noninvolvement. By telling appellant to "stay with the truth," Detective Stack was able to point out the benefits that might naturally flow from a truthful and honest course of conduct, including Lucero avoiding being charged as an accomplice and the district attorney being informed of appellant's cooperation. (*People v. Ramos*, *supra*, 121 Cal.App.4th at pp. 1202, 1204.)

E. Any assumed error was harmless

Even if appellant's confession should not have been admitted because it was involuntary, any error was harmless. (*People v. Cahill* (1993) 5 Cal.4th 478, 487.)

Apart from appellant's confession, ample evidence supports the jury's conclusion that appellant was guilty of attempted murder. Lucero's statements to law enforcement shortly after the shooting, coupled with Lopez's trial testimony, strongly implicated appellant as the shooter. It follows that any alleged error was harmless beyond a reasonable doubt.

II. *Instructions on Accomplice Testimony*

Appellant contends that the trial court's instructions on accomplice testimony were deficient and defense counsel's failure to request amplification of the accomplice instruction (and raise this theory during closing argument) constitute ineffective assistance of counsel. Appellant's argument notwithstanding, a request for natural and probable consequences doctrine for aider and abettor liability would not have been meritorious under these circumstances. And, even assuming counsel's performance was deficient, there is no reasonable probability that but for counsel's deficiency, appellant would have received a more favorable result.

A. Proceedings below

On July 11, 2011, the parties conferred to discuss jury instructions. At that time, the trial court indicated that it had added an accomplice instruction to "evaluate whether [L]ucero and/or [L]opez were accomplices to the crime, and then [an instruction was needed] on how to . . . evaluate their testimony if [the jury finds] that they are accomplices or find that they are not accomplices." While the trial court did not believe that Lucero and Lopez were accomplices as a matter of law, the jury could have found that they were, and therefore an instruction would be given to help the jury determine how to evaluate their testimony.

The trial court subsequently instructed the jury with CALCRIM No. 334 (accomplice liability).

B. Relevant law

To prevail on a claim of ineffective assistance of counsel, appellant must establish that his counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's deficient performance, the results of the trial would have been different. (*Strickland v. Washington* (1984) 466 U.S. 668, 686–687; *People v. Cunningham* (2001) 25 Cal.4th 926, 1003.) A conviction will be reversed for ineffective assistance of counsel only when the record demonstrates that there could have been no rational tactical purpose for counsel's challenged act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437.) Appellant must

affirmatively show counsel's deficiency involved a crucial issue and cannot be explained on the basis of any knowledgeable choice of tactics. (*People v. Ashmus* (1991) 54 Cal.3d 932, 1011, fn. 29.)

In considering a claim of ineffective assistance of counsel, it is not necessary to determine "'whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" (*In re Fields* (1990) 51 Cal.3d 1063, 1079.)

C. <u>No ineffective assistance of counsel</u>

The natural and probable consequences doctrine provides that one who knowingly aids and abets criminal conduct can be found guilty not only of the criminal conduct but also of any other crime the perpetrator commits that is a natural and probable consequence of the intended crime. (*People v. Ayala* (2010) 181 Cal.App.4th 1440, 1449.) A request for instruction on the doctrine should be granted "when (1) the record contains substantial evidence that [one] intended to encourage or assist a confederate in committing a target offense, and (2) the jury could reasonably find that the crime actually committed by the defendant's [c]onfederate was a 'natural and probable consequence' of the specifically contemplated target offense." (*People v. Prettyman* (1996) 14 Cal.4th 248, 269.) There is no sua sponte duty to instruct on the doctrine where the prosecution is not relying on the testimony of potential accomplices to prove appellant's guilt. (*People v. Gonzalez* (2002) 99 Cal.App.4th 475, 485.)

Here, as acknowledged by appellant, there was no sua sponte duty to instruct on the natural and probable consequences doctrine because the prosecution did not rely on that doctrine to prove appellant's guilt. In fact, as appellant concedes, the prosecutor urged the jury to find that Lopez and Lucero were not accomplices. But, appellant argues that defense counsel was required to request an additional or clarifying instruction to explain that Lucero and Lopez could be considered accomplices if they aided and abetted

an assault and if attempted murder was a natural and probable consequence of that assault.

We disagree. The purpose of the accomplice testimony instruction (CALCRIM No. 334) was to advise the jury on how to evaluate Lucero and Lopez's testimony—if the jury found that they were accomplices, then their testimony required corroboration; if the jury found that they were not accomplices, then no supporting evidence was required. The instruction given met that purpose. No further amplification or clarification was required.

For similar reasons, defense counsel's failure to argue accomplice liability to the jury does not amount to ineffective assistance of counsel. Defense counsel may have had tactical reasons for arguing the case to the jury as she did; there is no indication that appellant has demonstrated that "there simply could be no satisfactory explanation" for her conduct. (*People v. Hart* (1999) 20 Cal.4th 546, 623–624 ["'"Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." [Citation.]'"].)

D. <u>Any assumed error was harmless</u>

As set forth above, there was strong evidence corroborating Lucero's statements and Lopez's trial testimony, including appellant's admissions and ultimate confession to the detectives. Thus, even if defense counsel had requested the instruction and argued the possible implications of Lucero and Lopez's accomplice liability to the jury, it is not reasonably probable that he would have received a more favorable result. Thus, any alleged error was harmless.

III. *Sentencing*

Appellant contends that he was deprived of effective assistance of counsel at sentencing because defense counsel advocated for a "stay" of the gang enhancement when the enhancement should have been imposed or stricken. The People agree that the

19

matter should be remanded for this limited purpose, rendering the ineffective assistance of counsel claim moot.

A. Proceedings below

On January 31, 2012, probation was denied and appellant was sentenced to an aggregate term of seven years plus 25 years to life for attempted murder. The trial court selected the middle term of seven years for attempted murder; the 25 years to life term was imposed for the personal use of a firearm in the commission of an offense that resulted in great bodily injury. Although the trial court acknowledged that the jury also found the gang allegation to be true, it stated that, because of the firearm allegation, the gang allegation had "no [e]ffect" on sentencing. "[W]ith that understanding," the trial court sentenced appellant to the midterm of seven years, plus a consecutive term of 25 years to life for the firearm enhancement. In so doing, the trial court reiterated that the gang allegation was "stayed, having no [e]ffect as a result of the jury finding, the 12022.53[, subd. (d)] allegation true."

B. Relevant law

In general, when a sentence is in excess of the court's jurisdiction or in violation of the law, it is considered unauthorized. (*People v. Scott* (1994) 9 Cal.4th 331, 354 & fn. 17.) "'The failure to impose or strike an enhancement is a legally unauthorized sentence subject to correction' [citation], even if the correction results in a harsher punishment. [Citations.]" (*In re Renfrow* (2008) 164 Cal.App.4th 1251, 1254; see also *People v. Bradley* (1998) 64 Cal.App.4th 386, 390–391.)

C. Analysis

Here, the jury determined that appellant personally used or discharged a firearm in the commission of the attempted murder. Thus, the 10-year gang enhancement should have been imposed or stricken. (§ 12022.53, subd. (e)(2).) By failing to do either, the trial court pronounced a legally unauthorized sentence. (*People v. Serrato* (1973) 9 Cal.3d 753, 763, overruled on other grounds in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1.) Accordingly, the matter is remanded to the trial court for the limited purpose of allowing the trial court to impose or strike the additional term specified in

20

section 186.22, subdivision (b).  In addition, because the trial court appears to have based its midterm sentencing decision, at least in part, on the fact that it believed that the gang enhancement had no effect on appellant's sentence, it is allowed to reconsider the sentence for attempted murder.  Such "restructuring" does not amount to double jeopardy.  (*People v. Seel* (2004) 34 Cal.4th 535, 542.)

### DISPOSITION

The judgment is affirmed.  The matter is remanded to the trial court for the limited purpose of allowing the trial court to impose or strike the additional term specified in section 186.22, subdivision (b).  In so doing, the trial court may reconsider the sentence for attempted murder.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
          ASHMANN-GERST


We concur:




_____, P. J.
     BOREN




_____, J.
     CHAVEZ




21